STANLEY HAGERMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78023. Promulgated October 20, 1936.

*Russell D. Morrill, Esq., Henry Mannix, Esq.*, and *Francis L. Casey, Esq.*, for the petitioner.

*John D. Kiley, Esq.*, for the respondent.

1164

OPINION.

DISNEY: The issues presented for our determination are (1) whether it is practicable to apportion fairly to the declarations of interest sold by the petitioner a part of the unit cost of his stock in the Bank and in the Security Co., and (2) if so, what cost should be apportioned to such declarations of interest, otherwise designated herein Security Co. stock.

The petitioner contends that it is practicable to apportion fairly the cost of the units of Bank stock and Security Co. stock on the basis of their respective values at the dates of purchase (1) on the basis of the respective asset values of each stock and (2) on the basis of their respective values, as appraised by the expert witnesses, who testified at the hearing.

The Commissioner controverts both of petitioner's contentions.

The statute applicable to the issues involved herein is found in the Revenue Act of 1932, sections 111 (a) and 113 (a). That act and prior acts provide for an apportionment of cost under certain circumstances, the method of apportionment of cost of property re-

ceived in connection with tax-free distributions being left to rules and regulations prescribed by the Commissioner. See *Philip D. C. Ball*, 27 B. T. A. 388, 394; affd., *Von Weise* v. *Commissioner*, 69 Fed. (2d) 439, and authorities therein cited. Article 58 of Regulations 77, which is quoted by both petitioner and respondent herein, provides in part as follows:

* * * Where common stock is received as a bonus with the purchase of preferred stock or bonds, the total purchase price shall be fairly apportioned between such common stock and the securities purchased for the purpose of determining the portion of the cost attributable to each class of stock or securities, but if that should be impracticable in any case, no profit on any subsequent sale of any part of the stock or securities will be realized until out of the proceeds of sales shall have been recovered the total cost.

Inasmuch as both parties have quoted said article, they seem to be in accord that this is a case arising thereunder. No regulation seems to provide definitely for an apportionment of cost under the exact circumstances arising in this case, but it comes within the general principle embodied in the above statute and regulations.

In the instant case, during all of the period from 1908 to 1933 there were two separate corporations, a bank and an investment company, with separate assets, liabilities, income, dividends, and businesses.

The Security Co. commenced business with a capital of $10,000,000 in cash, which was largely invested in high-grade stocks paying large amounts in dividends. Schedules of net asset value, earnings and dividends of the Security Co. and of the Bank were stipulated and were known to and considered by the witnesses who as experts expressed opinions, as indicated in our findings of fact.

The Bank stock prior to the formation of the Security Co. and thereafter bearing the Security Co. endorsement, the record shows, had been traded in on the "over the counter" market in New York City and the market price of the units had at all times exceeded the combined net asset values of the Bank and Security Co.

By the testimony of witnesses and other evidence in the record, it was, in our opinion, shown that the fair market price of the aforesaid units at all times exceeded the market value of the Bank stock if considered separately and so offered for sale. Each of the two stocks, or interests, at all times had a value. The aforesaid agreement between stockholders that neither stock should or could be sold separately did not have the effect of depriving either stock of its value nor, in our opinion, did the agreement make the determination of their separate values impossible or impracticable. Cf. *Collin* v. *Commissioner*, 32 Fed. (2d) 753; *Newman* v. *Commissioner*, 40 Fed. (2d) 225, 227; certiorari denied, 282 U. S. 858; *Tex-Penn Oil Co.* v. *Commissioner*, 83 Fed. (2d) 518.

There were no actual sales of either Bank stock or Security Co. stock separate from the other at any time prior to December 1933, so that it is impossible to determine the values of either stock on the basis of sales. The absence of sales, however, in our opinion, does not necessarily make impossible or impracticable the determination of the fair market value of the separate stocks or interests or their value for the purpose of apportionment.

We have heretofore held: "The absence of active trading in a stock does not necessarily show lack of fair market value, and under the circumstances other evidence, including evidence as to the intrinsic value of the assets back of the stock, should be considered in determining whether the stock had a fair market value." *George M. Wright*, 19 B. T. A. 541, 548; affd., 50 Fed. (2d) 727; certiorari denied, 284 U. S. 652. See also *George W. Griffiths*, 25 B. T. A. 1292; affd., 70 Fed. (2d) 946; *Helvering* v. *Kendrick Coal & Dock Co.*, 72 Fed. (2d) 330; certiorari denied, 294 U. S. 716.

The unit here involved was created by a voluntary agreement and consisted of two separate interests in corporations possessing different powers, one organized because the powers of the other were too limited to permit it to do certain business desired to be done by parties interested in both corporations.

In *Tex-Penn Oil Co.*, *supra*, the Board, 28 B. T. A. 917 (961–966), considered the effect of a restrictive agreement imposed by a banker's syndicate which, it was contended, prevented realization of income because by the agreement certain corporate stock could not be sold. After reviewing a number of cases involving restrictive agreements, we concluded that the restrictive agreement did not militate against the fact of value in the stock. We emphasized the fact that the restriction was voluntary, and temporary, to some extent, during the life of the banker's syndicate. We have the same principle in the instant case. The restrictive agreement herein was wholly voluntary, entered into by the stockholders of the bank and, through trustees, by the stockholders of the Security Co.; likewise it was temporary, for a period of five years and thereafter until terminated by a vote of the holders of two-thirds of the stock. Obviously, being voluntary, the restrictive agreement could have been terminated at any time by the agreement of those who made it, but after five years it required only a two-thirds vote. The opinion of the Circuit Court in *Tex-Penn Oil Co.*, *supra*, reversing this Board, on this point, does not suggest that the Board's conclusion was incorrect as to voluntary agreements, but pointed out that the agreement was, in fact, an involuntary one. We conclude then that that decision agrees that a purely voluntary agreement, as in the instant case, would, as we held, not prevent the imposition of the tax upon any profit calcu-

lated upon a value of the stock, notwithstanding the agreement was restrictive against sale.

In *T. W. Henritze*, 28 B. T. A. 1173, we held that shares of stock received in a reorganization under an agreement stamped on the certificates not to sell them for a year without a certain banker's consent were not without fair market value for purposes of computing taxable profit on an exchange. If in that case there was fair market value for computing taxable profit, then obviously there is fair market value for purposes of arriving at a basis in the present case where the restrictive agreement is so remarkably similar to that in the cited case.

*Collin* v. *Commissioner*, 32 Fed. (2d) 753, reversed this Board in a case involving income tax on profits from sale of common and preferred stock in units consisting of one share of preferred and two shares of common. The constituents of these units could not be sold separately because of a prohibition by the Ohio Commissioner of Securities, to which the parties had agreed. The taxpayer, therefore, contended that apportionment of value between the preferred and common stock was impracticable, relied upon regulations, the same in effect if not in words as those involved herein, and contended, as herein contended by the respondent, that gain or loss should not be computed until the final sale of all the stock. The Commissioner took the view that the common stock had no value—which, of course, entailed determination of proportionment values. We found, as a matter of fact, that no part of the consideration was paid for the common, and assigned as cost to the preferred the entire consideration given for both, but the Circuit Court said:

> We are satisfied that some part of the total price paid for the stock units was paid for the common stock—what part we are unable to determine on the record here. Upon another hearing it may be practicable to obtain data or facts upon which a fair apportionment of cost as between the two classes of stock may be made, but, if it should not be, then, under article 39 of Regulation 45, the petitioner will not be chargeable with any profits until he shall have recovered the entire purchase price.

It is obvious, therefore, that the above court considered the very situation herein involved—but concluded that evidence, data, or facts, should be sought as a basis for a fair apportionment of cost. These data and facts were sought and presented before this Board in the instant case. The cited case is authority for a conclusion that despite the restrictive agreement herein, a proper inquiry was made by this Board into the practicability of apportionment.

It is only because the unit was in fact separated and one of its constituent parts sold that the present issue arose. The evidence clearly indicates that each of the component parts of the unit had a monetary value; one part of the unit being the stock of a long

established bank and the other the stock of, or an interest in, an important investment company.

The instant case is not like the case of *Erskine Hewitt*, 30 B. T. A. 962, which is cited and relied on by the respondent. In that case, the "Petitioner purchased both the bonds and coupons after the latter had matured and were in default." The principal of the bonds and the matured interest coupons in default, we held, were not "different classes of property where it is contemplated that an apportionment of costs be made, if practicable." The facts and circumstances in the instant case, with respect to the Bank stock and the Security Co. interest or stock, are quite different from those in the *Hewitt* case, *supra*, and the latter is not, therefore, applicable nor controlling.

The only other decision cited by the respondent is *Edwin D. Axton*, 32 B. T. A. 613, which is also distinguishable upon the facts from the instant case. In the *Axton* case, *supra*, there were two different kinds of stock received in exchange for a third kind of stock, but there was no satisfactory basis of comparison of the values of the two types of new shares received and we held that the book value in that particular case was an unsatisfactory basis of comparison, and stated:

\* \* \* Consideration has been given to all of the evidence and it indicates with reasonable certainty that no figure can be satisfactorily fixed upon to represent the value of the class B stock at the time it was received by these petitioners. Under such circumstances the entire old basis should be recovered out of the proceeds and the excess taxed as income as received. \* \* \*

The *Axton* case does, however, support the introduction and consideration of the opinion evidence upon which the petitioner relied in this case to establish fair market value; for that case shows that opinion evidence of experts was used in an attempt to arrive at a fair market value. The effect of the *Axton* case is, therefore, that a proper method was used in this case to arrive at the fair market value, although the facts of that particular case, as found by the Board, showed that there was no fair market value of the class B stock therein.

In the instant case the situation is quite different, as our findings of fact show, and "It is well settled that where property is acquired *en bloc* or *en masse* and subsequently sold in lots or parcels, a computation of gain or loss must be made upon each separate sale and the result reported in the tax return and not held in abeyance or suspense until the entire cost of the property is recovered." *Banc-italy Corporation*, 34 B. T. A. 494, 504. The principle above enunciated, in our opinion, is applicable in the instant case, since it is not impracticable in the circumstances to apportion fairly the cost of the component elements making up a unit of said Bank stock and the endorsement thereon of beneficial interest in the Security Co.

This case is in all essential particulars the same in principle as *Glenn H. Curtiss*, 21 B. T. A. 629; affd., 57 Fed. (2d) 847. Therein the Curtiss Aeroplane & Motor Corporation was reorganized and, instead of stock therein, each stockholder received stock in a new company, the Curtiss Aeroplane & Motor Co., and a certificate of beneficial interest in the Curtiss Assets Co. Later, in 1924, the petitioners sold their certificates of beneficial interest in the Curtiss Assets Co. We approved apportionment of value to the certificate of interest. The certificate of beneficial interest in the Curtiss Assets Co. is not essentially different from the certificate of interest in the Security Co. in this case. In both cases it was a certificate of participation in a company other than the original company. It is true that in the present case there was a prohibition upon alienation separate from the original stock.

Impracticability has been defined as incapable of being effected from lack of adequate means, impossible of performance, not feasible. *Des Portes* v. *Southern Railway Co.*, 69 S. E. 148; *People* v. *Poly*, 40 N. Y. S. 990, 992. Also, it has been said that "impracticability" and "impossibility" are of equal legal effect. *Cosden Oil & Gas Co.* v. *Moss*, 267 Pac. 855. We can not believe that it was "impracticable" to arrive at separate valuations upon the Bank stock and the certificate of participation in the Security Co. in this case. Obviously, it was not impossible, not even particularly difficult. The evidence used was competent under the *Axton* case, *supra*, and the difference of opinion between the witnesses was no more than indicative of good faith testimony.

In *Salvage* v. *Commissioner*, 76 Fed. (2d) 112, the taxpayer made the very contention herein made by the respondent, that is, that the entire cost of the old stock must first be recovered, but the court, although, as in this case, there were no actual sales, considered the fact that the business had been extraordinarily successful over a period of several years (very similar to the situation herein) and approved the Board's finding that the apportionment was practicable, citing, among other cases, *Houghton* v. *Commissioner*, 71 Fed. (2d) 656, wherein the Commissioner did find a basis for value of stock received in exchange for former stock by examination of the average income of the company and appraisal of tangibles and intangibles. The court remarks: "The question is not so much whether the value fixed was right as whether the shares had any 'market value' at all", and refers to the fact that the business was an old, profitable, thoroughly seasoned one, and that although the stock had not been dealt in, there might have been persons familiar with such securities who would have undertaken to appraise them, whose evidence would have been reliable judgment as to their market value. This seems to be substantially what was done in the instant case.

We hold, upon the facts herein, that it was possible and practicable to apportion fair market value to the certificates or declarations of interest at the time of purchase thereof.

The stipulated facts and the testimony furnished, in our opinion, a satisfactory basis for a fair apportionment of the unit cost to the Bank stock and the beneficial interest or stock in the Security Co.

Upon consideration of the entire record and the authorities cited in briefs of counsel, we are of the opinion and hold that a fair apportionment of aforesaid unit cost to declarations of interest in the Security Co. in the particular circumstances of the instant case is practicable.

Therefore, we are of the opinion and hold the cost per share of the declaration of interest in the Security Co., as of the following dates: December 26, 1918, December 16, 1919, and September 16, 1931, was in the respective amounts of $458, $344, and $1,281; upon which basis the tax will be recomputed.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

———

MELLOTT, dissenting: The petitioner purchased a share of bank stock and thereby became entitled "to share equally and ratably with all other holders of stock certificates of the Bank similarly endorsed, according to their several interests, in the dividends or profits, and, in the case of dissolution, in the distribution of the capital" of a security company. The security company had been organized in conformity with an agreement which provided that the "* * * officers or directors of the bank shall be the directors, and, as joint tenants and not as tenants in common, shall be stockholders, in such way, however, that the beneficial interest resulting from such stock (but not the right to vote) may accrue continuously and irrevocably to such persons assenting thereto as from time to time shall be registered stockholders of the Bank or of its successor, severally and respectively, in proportion to their registered holdings of the stock of the Bank or of its successors * * *."

The holding of the majority to the effect that petitioner became a stockholder in the security company, through the purchase of a share of the Bank stock bearing the endorsement set out in the opinion, seems to me to be wrong. He did not buy two separate shares of stock, one in the Bank and one in the security company. He could not do so. He bought a share of Bank stock. That is what was "actively traded in * * * 'over the counter'" and "all quotations of prices for Bank stock were for certificates of stock bearing that endorsement."

If the unit which he bought—the bank stock with the endorsement—had been sold, gain or loss would have been computed upon

its cost. But he did not sell it as a unit. He surrendered it on December 9, 1933, and, in the language of the majority, "in exchange therefor * * * received * * * certificates of Bank stock without said endorsements and declarations of interest." This, it seems to me, is analogous to the situation which the Board had before it in *Glenn H. Curtiss*, 21 B. T. A. 629. It was there held that the cost of the exchanged securities should be apportioned to the securities received in the exchange according to the respective market values of the securities at the time received in the exchange. The Circuit Court affirmed, *Curtiss* v. *Commissioner*, 57 Fed. (2d) 847. Cf. I. T. 2302, V-2, C. B. 15. *Sallie Strickland Tricou*, 25 B. T. A. 713-723; affd., 68 Fed. (2d) 280; certiorari denied, 292 U. S. 655. (Rule recognized but not applied for lack of proof.) *Frances Elliott Clark*, 28 B. T. A. 1225; affd., 77 Fed. (2d) 89. I. T. 2335, C. B. VI-1, p. 18. *Fifth Avenue Bank of New York, Executor*, 31 B. T. A. 945; affd., 84 Fed. (2d) 787. *H. A. Green*, 33 B. T. A. 824 (petition to review dismissed, C. C. A., 9th Cir.).

In *H. A. Green, supra*, we pointed out that while there is no specific provision in the statute directing an apportionment of cost between two or more kinds of property received in a nontaxable exchange (which, it seems to me, is what we have here) still article 1567 of Regulations 62, interpreting the Revenue Act of 1921, must be considered as laying down a principle which is equally applicable in determining gain or loss under subsequent revenue acts. This regulation provides in part as follows:

* * * the proportion of the original cost, or other basis, to be allocated to each class of new securities is that proportion which the *market value* of the particular class bears to the *market value* of all securities received on the date of the exchange. * * * [Italics supplied.]

This is certainly a more "practicable" solution of our problem than that adopted by the majority.

ARUNDELL, VAN FOSSAN, and ARNOLD agree with this dissent.