*1392 OPINION.
SteRnhagan :
The petitioners demand a deduction in 1933 for loss because of the worthlessness of the shares of the Continental Corporation of New York, the “investment corporation.” The Commissioner disallowed the deduction for the reason that “* * * no part of the cost of the [bank] stock can be allocated to the [investment corporation] stock.”
The shares of the investment corporation were owned by the trustees, and the petitioners’ interest in them was that of beneficiaries of the trust, a position which was always incidental to their ownership of shares in the bank. Notwithstanding this unity, petitioners have undertaken to prove a cost basis to them of the investment corporation shares, by way either of direct cost or of apportionment in the manner of Regulations 77, article 58.[2] They rely heavily on the Board’s decision in Stanley Hagerman, 34 B. T. A. 1158 (on review C. C. A., 3d Cir.), where an allocation was used to arrive at a basis for computing gain from the sale of interests in a security investment corporation similarly affiliated with a bank. There was some similarity in the purpose of organization of the Security Co. in that case and of the organization of the investment corporation in this, but the allocation of basis as between the bank shares and the Security Co. shares, found practicable in the Mag&rman case, was predicated, largely upon an actual separation. The Board said it was “only because the unit [of bank and Security Co. shares] was in fact separated and one of its constituent parts sold that the present issue arose.” It may not be assumed that allocation would have been recognized as proper if there had been no such separation.
The petitioners say that they sustained a loss when the investment corporation dissolved without assets and its shares became wortliless. We find it impossible to accept this view. Strictly speaking, in accordance with the conception which underlies the trust agreement of May 1, 1929, they were never the owners of investment corporation *1393 shares from the time of its organization until its dissolution. Their investment was always in shares of the bank, and indissolubly within that investment was embedded their more remote interest in the affairs of the investment corporation; and that interest went only so far as those affairs, conducted by the directors of the bank, might result in distribution to the trustees and in turn to them. In 1929 petitioners paid $40 entirely to the bank and the bank was to use $10 of it as a subscription for two shares of investment corporation stock to be issued to the trustees, who were the bank’s directors. Aside from the New York law’s requirement of a separate corporation, the affairs conducted in the name of the investment corporation were inseparable from those of the bank. They were conducted by the same persons, not because they happened to be holding positions as directors of both corporations, but because it was designed so and anything else was inherently impossible. The identity of a trustee was not in his person but in his position as a director or officer of the bank. Thus it was assured that there could be no conflict between the interests of the two. This unity was carried out in the identity of bank shareholders and trust beneficiaries; in distributive interests of the investment corporation, one being proportionate to the other; and in the evidence of both being shown by the same certificate. To all this was added the injunction that no holder might dispose of either alone; both must be held inseparably. This unitary conception was thoroughly adopted and adhered to by everyone at all times throughout the life of the enterprise at every stage and in every change in its course. Through the Smith & Gallatin transactions (with one unimportant exception) and through the Straus and International merger the composite units were preserved. The new corporation was never for a moment treated practically as independent. During the merger the investment corporation transferred its assets to the bank’s distributing agent, changed its shares with changes by the bank, and transferred its assets so that after the merger it owned the Thirty Broad Street shares, worth $2,000,000 more than the assets given up.
The final event which is relied upon to demonstrate the petitioners’ loss is itself an indication of the inseparable composite character of their investment. The Thirty Broad Street Building was found to be unprofitable. In itself this was not a recognizable loss to its owner, the Thirty Broad Street Corporation, but merely a failure of expected profits; it still owned the building, subject to a mortgage, and the mortgage had not been foreclosed. In actual value its assets were less than its liabilities. To its only shareholder its condition was not such an “identifiable event” as to establish a deductible loss. For its own reasons, the investment corporation transferred the shares of *1394 Thirty Broad Street Corporation to the mortgagee; and thus by its own act it made itself destitute and its own shares worthless. The teust corpus consisted of only such worthless investment corporation shares, and petitioners as beneficiaries were thus forever deprived of the expectation of trust distributions of amounts received by the trustees as dividends and capital distributions of the investment corporation. But the petitioners still had their bank shares for which they had paid various amounts at various times under various circumstances, all including the $40 per share in June 1929, of which $10 was in turn used by the bank to subscribe for two shares of the new investment corporation.
The conclusion which seems to us inevitable is that petitioners’ investment must be regarded as existing in their bank stock and that their relation to the investment corporation and the trust was an inherent part of their ownership of bank shares, the ultimate disposition of which will reflect gain or loss upon the full basis of their cost.
But if it were proper to consider the petitioners’ investment as divisible between the bank shares and the beneficial interest in the investment shares, the question of the practicability of apportionment of basis would become important. We should find such an apportionment wholly impracticable. There is only a short parallel of the complex circumstances of acquisition here, as in deCoppet’s case, and the comparatively simple circumstances of the transactions considered in Stanley Hagemnan, supra. These petitioners bought shares for cash, acquired them by inheritance, in discharge of loans, as dividends, and by the exercise of rights; both corporations canceled shares, 'the bank participated in a merger which involved a change in the investment corporation’s share structure, and its assets and liabilities were shifted for the convenience of the bank. The problem of computing the basis of shares in the investment corporation is thus far more difficult than in the cases cited.
Complexity and difficulty of computation are in themselves insufficient reasons for denying the deduction, and neither the Commissioner nor the Board may refuse to ascertain the amount of deduction merely because its computation is a burdensome task. The question whether an apportionment is practicable, however, goes further.
If this case had involved but the sale by each petitioner of a separate share in the investment corporation received from the trustees at a time when the shareholder’s right thereto was the direct result of his paying the $40 to the bank upon the understanding that $10 would be turned in to the investment corporation, the gain or loss from such a sale might have been computed upon the basis of such $10 for each two shares sold. That, however, is not the question to be decided. The acts of June 1929 were still more complex and were soon enmeshed in such later transactions as obscured them entirely. *1395 Any calculation of a separate basis would require some appraisal of several imponderable factors. The $2,000,000 gain in Thirty Broad Street shares is illustrative. The apportionment would be entirely artificial and quite unworthy of use — hardly reliable enough to be called “practicable.”
The necessity is thus eliminated for considering the question whether there was a statutory reorganization in September 1931 affecting the basis of the investment shares, and also for considering the question, affirmatively raised by the respondent, whether in any event petitioners are estopped.
The Commissioner’s determination is sustained.
Reviewed by the Board.

Decision will be entered wider Rule 50.

Leech, Disney, and Kern concur only in the result.

 * * * Where common stock Is received as a bonus with the purchase of preferred stock or bonds, the total purchase price shall be fairly apportioned between such common stock and the securities purchased for the purpose of determining the portion of the cost attributable to each class of stock or securities, but if that should be impracticable in any case, no profit on any subsequent sale of any, part of the stock or securities will be realized until out of the proceeds of sales shall have been recovered the total cost.
[[Image here]]