## DE COPPET v. HELVERING, Commissioner of Internal Revenue.

### No. 88.

Circuit Court of Appeals, Second Circuit.
Jan. 15, 1940.

Elden McFarland, of Washington, D. C., and G. A. Donohue, of New York City, for petitioners.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Helen R. Carloss, Sp. Assts. to Atty. Gen., for respondent.

Before L. HAND, CHASE, and PATTERSON, Circuit Judges.

L. HAND, Circuit Judge.

The question on which this appeal turns is whether one of the taxpayers, the husband, should have been allowed to deduct as a loss in 1933, the cost of his interest in certain shares of stock in the Continental Corporation, a New York corporation organized in 1929, which was wound up without assets in 1933. He claimed the deduction under § 23(e) (2) of the Revenue Act of 1932, 26 U.S.C.A. § 23 (e) (2), as a one, "incurred in" a "transaction entered into for profit, though not connected with * * trade or business". The Commissioner disallowed the deduction on the ground that the taxpayer's interest in the shares was not an independent investment, but merely a part of his holdings in the shares of the Continental Bank, another corporation, and that the collapse in value of the Continental Corporation's shares was no more a "realized" loss, than if they had been those of a corporate subsidiary, owned by the Bank. A majority of the Board took the same view, and the taxpayer appealed. The question therefore is whether the taxpayer's interest in the Continental Corporation's shares was separate enough from his holding of shares in the Continental Bank to make their total extinction a "realizable" loss.

On April 10, 1929, the Bank had 10,000 shares outstanding of the par value of $100; the directors on that day passed a resolution changing these to 100,000 at $10 par, and increasing the authorized capital to 200,000 shares. The new shares it offered to its shareholders at $40 a share, to be subscribed for, share for share of their then holdings. Ten dollars of every forty so subscribed was, however, to be invested in two shares of a new company, the Continental Corporation, to be organized with a capital of 200,000 shares at $5 par. If all the rights to subscribe were taken up under this offer, each shareholder of the Bank would therefore hold precisely the same number of shares in the proposed company that he held of bank shares. The new venture was put forward in order to allow the Bank's shareholders "to take advantage of opportunities for investment that are presented from time to time, in the ordinary course of the business of the Bank, which the Bank cannot avail itself of", because the law forbade its holding such assets as the directors expected to trade in. That is, the new corporation was to be an investment company, dealing in securities that were not lawful for banks. By an agreement of May 1st, 1929, every subscriber to the new bank shares agreed that the two investment shares, bought by the ten dollars ear-marked for that purpose, should be issued to three trustees, one, the Bank's president, and the other two, its directors; there were never to be less than three trustees, nor more than the number of the Bank's directors; vacancies were to be filled coöptatively, but always from directors or officers of the Bank; and any trustee who ceased to be a director or officer was ipso facto to cease to be a trustee, "it being intended that only officers and directors of the Bank shall act as Trustees". The trustees were to hold the shares in trust for such shareholders of the Bank as got their certificates for

bank shares endorsed that they were "entitled to a beneficial interest in the capital stock" of the investment company "from time to time held by the Trustees * * * ratably with all other stockholders of the Bank * * * bearing an endorsement * * * similar * * * to this endorsement. The said beneficial interest is transferable only by the transfer on the books of said Bank of the shares * * * represented by the within certificate". All future certificates of bank stock were to be similarly endorsed. The Bank's shareholders were to get only such rights in the investment shares as the agreement gave them; that is, the trustees were to pay them "all dividends upon the capital stock of the Company * * and all distributions of capital"; but were not to distribute any stock dividends. The trustees alone were to have power to vote, and they were to receive any new shares issued, all privileges to subscribe being vested in them. The agreement might be "amended or modified with the written consent of the Trustees and of two-thirds in interest of those for whom the capital stock of the Company is then held * * * and may be at any time terminated with the written consent of three-fourths in interest".

All the new bank shares were subscribed, and all the shareholders, new and old, submitted their bank shares to be endorsed. Thereafter the Bank entered into a series of extremely complicated financial transactions, which, as we view the law, are irrelevant. It is enough that the result in each case was that the trustees held all outstanding investment shares for each bank shareholder upon the terms of the agreement of May 1st, 1929; and in that proportion which his holdings of bank shares bore to the total shares outstanding. Nor is it necessary to follow the vicissitudes of the assets of the Continental Corporation, which were changed from time to time until it became no more than a depositary of the shares of a building corporation, the value of the assets of which had by 1933 dropped so far below the amount of a mortgage upon them, that the Continental Corporation surrendered the shares to the mortgagee, and, being then wholly stripped of assets, was itself dissolved. The taxpayer had been a large shareholder of the Bank before 1929, and had subscribed for his proportion of the new bank shares in that year, becoming in this way entitled to a corresponding interest in the investment shares. Later he added to his holdings in bank shares, and pari passu to his interest in the investment shares. His attempted deduction was computed by allocating a certain part of the cost of all these purchases to the investment shares; and this was so difficult and complicated (due to the later transactions of the Bank) that the Board found it not to be "practicable", apparently by analogy to Article 58 of Regulations 77.

The purpose of the Bank's excursion outside of banking was to allow its shareholders to invest in securities which the law forbade their putting the Bank's money into. The device was not to secure the Bank's assets against possible creditors of the investment company; they would have been equally secure, if the Bank had been legal owner of the shares; it was merely because all money, paid for authorized shares, must be invested in banking assets. For all purposes except conformity with banking requirements the result was, however, substantially the same as though the Bank itself held the shares. If the Bank had been sole shareholder, its directors could have managed the investment company's property as they thought best, and the bank shareholders could have controlled them only through their power to elect or remove them. Since the trustees, who were the holders of the investment shares, must be directors or officers of the Bank, they were equally subject to the control of the bank shareholders, but no more so. Again, the beneficial interest of the bank shareholders was the same as though the Bank were sole holder of the investment shares. We may assume, arguendo, that in New York a shareholder has no equitable interest in any of the assets of the corporation. Burrall v. Bushwick R. R. Co., 75 N.Y. 211, 216; Plimpton v. Bigelow, 93 N.Y. 592, 600; Van Brocklen v. Smeallie, 140 N.Y. 70, 78, 35 N.E. 415. Though see Flynn v. Brooklyn City R. R. Co., 158 N.Y. 493, 504, 53 N.E. 520. Hence it would certainly have made a great difference how the investment shares were held, if they were not locked to the bank shares. But they were; it was impossible to sell them without selling the bank shares, or to sell the bank shares without selling them. We do not say that no differences can be conjured up between the legal form chosen and the usual share holding of a subsidiary; but they are immaterial to the subject at hand. The beneficial interest was as much an appurtenance of the bank shares as an easement is of the servient tenements; it merely gave them an added value, precisely as it would have done,

had the Bank been the shareholder. Collectively the same persons must always be equitable owners of the investment shares and shareholders of the Bank, and in the same proportion; there never could be one group holding bank shares, and another holding investment shares. So far as a corporation is the aggregate of its shareholders in respect of their collective rights and obligations, there was but one corporation.

We do not see why the situation was different because the bank shareholders could modify the trust by a two-thirds vote, if the trustees agreed; and could terminate it by a three-fourths vote, if they did not. Again, if the Bank had had legal title to the shares, it could have distributed them by a mere majority vote, unless indeed such a distribution could be regarded as a change in the charter; and even then a two-thirds vote would have been enough, at least with the consent of the Superintendent of Banks. New York Stock Corporation Law (Consol. Laws, c. 59) § 35; New York Banking Law (Consol.Laws, c. 2) § 113-a. Certainly it cannot be said that the powers of the equitable owners of the investment shares were greater under the trust.

The important matter is not what formal legal differences there were between the model adopted and the ordinary case of a corporate subsidiary; but whether the investment was single. It was if the investor could not have dealt with the parts separately; and these investors could not. When we speak of an investment, we do not think of the various ventures in which the company may be engaged, or of the various properties it may hold. We think of the unity which we must deal with as such, regardless of the particular legal paraphernalia in which it is clad. It is from that background that § 23 (e) (2) speaks, and the Board was right in holding that here there was but a single investment.

In Hagerman v. Commissioner, 34 B.T.A. 1158, affirmed 3 Cir., 102 F.2d 281, the facts were not quite the same, though near enough to be a precedent if either tribunal consciously meant to decide the point. It is somewhat difficult to know whether that was the case; the discussion turned chiefly upon whether it was "practicable" to ascertain the "basis" of the exchange, though the opinion of the minority certainly skirted very close to what we are deciding. The majority opinion of the Board here attempted to distinguish the case on the ground that the two interests were severed by an exchange; but we cannot agree that that was vital. Unless the shareholder's interest in the quasi-subsidiary was separate before its dissolution in the sense that a true subsidiary's is not; that is, unless there had always been two investments, the exchange could not have "realized" a loss. Since it was held to have done so, the case can be distinguished, if at all, only because the point was not mooted. In any event, however understood, we do not regard the decision as authoritative.

Order affirmed.