**WARREN et al. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 4592.

United States Court of Appeals
First Circuit.

Jan. 28, 1952.

James D. Dow, Jr., Boston, Mass., for petitioners.

Hilbert P. Zarky, Sp. Asst. to the Atty. Gen. (Ellis N. Slack, Acting Asst. Atty. Gen., and A. F. Prescott and Howard P. Locke, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

The executors of the estate of Bentley W. Warren seek review of the Tax Court's determination that their decedent's income tax for 1944 was deficient in the amount of $5287.84. The dispute is whether taxpayer had a gain or a loss upon the sale of certain securities in that year. It is a highly technical matter of applying the statutory language, with no broad equitable considerations pointing either way, so far as we can see.

At various times between February 20, 1919, and February 19, 1926, at a total cost of $21,231.25, decedent purchased 578 shares of the preferred stock of a business trust originally set up in 1905 for a term of 21 years under the name of Springfield Railway Companies and reconstituted at the end of that term for an additional ten years as Springfield Railway Companies—1926. Springfield, as both trusts will be called herein, held as its only asset a majority of the capital stock of an operating street railway company.

At the time Springfield was created, payment of annual dividends equal to 4 per cent of par, and of liquidating dividends in the amount of $105 per share, upon its preferred stock, was guaranteed by The Consolidated Railway Company. The guaranty was contained in an indenture between Consolidated Railway Company and Springfield Railway Companies, wherein the guarantor was given an option to purchase the whole issue of preferred stock at $105 per share on any dividend day. As provided in the indenture, Consolidated indorsed the terms of the guaranty agreement on each certificate of Springfield's preferred stock. In 1909 Consolidated merged with The New York, New Haven & Hartford Railroad Company, and the latter company assumed all the obligations of Consolidated, including its guaranty with respect to Springfield's preferred stock. Thereafter each new certificate of preferred stock issued by Springfield bore the guaranty indorsement of the New Haven.

The New Haven went into reorganization under § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, in 1935, and in April, 1936, the president of Springfield sought, in the reorganization proceeding, instructions with respect to proving claims under the guaranty, the extended term for which the business trust had been reconstituted having expired some weeks earlier. The reorganization court directed Springfield to sell its assets and distribute the proceeds so that the amount of the claim against the guarantor might be determined with precision.

Since the sum realized on the ensuing sale was small, Springfield could pay on the preferred stock no more than a liquidating dividend of 25 cents a share, which was done in 1939. Springfield's common stock was declared worthless and the affairs of that business trust were terminated. Thereupon the reorganization court allowed a common, unsecured claim against the New Haven in the sum of $106.75 ($105 plus accumulated dividends) for each share of Springfield preferred, this being the amount due under the aforesaid guaranty. The Springfield preferred share certificates were retained by decedent as evidence of this newly perfected claim against the guarantor. Although the stipulated facts are somewhat vague on the point, the Tax Court found, correctly, as petitioner is content to admit, that these certificates had a fair market value of 75 cents a share at the time immediately following Springfield's liquidation in 1939.

Decedent-taxpayer's income tax return for 1939 claimed no loss on account of the foregoing matter, nor did his return reflect either the 25 cents per share liquidating dividend or the perfection of his claim against New Haven on the guaranty. However, in 1944 taxpayer sold for the sum of $11,366.44 the 578 certificates of preferred stock for which he had paid an aggregate of $21,231.25. In that year he reported a long-term capital loss determined by reducing the basis of the 578 shares by 25 cents each (the amount previously received with respect to each share in the liquidation of Springfield), and by subtracting from this adjusted basis the amount realized upon the sale.

In a deficiency letter dated June 10, 1949, the Commissioner asserted an over-assessment of $1453.21 for 1939 and a deficiency of $5287.84 for 1944. The Commissioner's position is that upon the liquidation in 1939 the taxpayer exchanged each share of stock for 25 cents cash and a claim against the New Haven which had a value of 75 cents; that taxpayer thereby realized a recognizable loss on his stock, and acquired a new basis of 75 cents for each of the 578 certificates which then came to represent only the claim against the guarantor rather than an equity interest in Springfield. Hence, when the certificates were sold in 1944 for considerably in excess of 75 cents a share, a gain was thereby realized.

Our jurisdiction in this case extends only to review of the deficiency determination for 1944, and not to review of the Commissioner's determination of an over-assessment in 1939. However, a consideration of the tax consequences of the liquidation of Springfield in 1939 is essential to a determination of the proper tax treatment of the sale in 1944. Therefore our discussion cannot be confined to the latter year.

Portions of the Internal Revenue Code most pertinent to this dispute are §§ 115(c) and 111(a) and (b), as follows, 26 U.S.C. A. §§ 115(c), 111(a) (b):

"§ 115. Distributions by corporations.

\* \* \* \* \* \*

"(c) [As amended by § 147 of the Revenue Act of 1942, Ch. 619, 56 Stat. 798.] *Distributions in liquidation.* Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. \* \* \* "

"§ 111. Determination of amount of, and recognition of, gain or loss.

"(a) *Computation of gain or loss.* The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113(b) for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

"(b) *Amount realized.* The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received."

It is apparent that if Springfield owned the New Haven guaranty as one of its assets, and upon liquidation in 1939 "distributed" that asset to its preferred shareholders who then "received" it, the statute would require taxpayer to recognize a loss on his investment at that time. On this assumption, the fair market value of the guaranty together with the cash dividend would be "Amounts distributed in complete liquidation" which § 115(c) requires to "be treated as in full payment in exchange for the stock" so that "The gain or loss to the distributee resulting from such exchange shall be determined under section 111". In accordance with subsection (a) of § 111, the loss would be the adjusted basis less the amount realized, the latter being, in accordance with subsection (b) of § 111, the cash received plus the fair market value of the guaranty. If the case were as supposed, the taxpayer, having exchanged his equity interest in Springfield for cash and the

guaranty, would have had a new basis for the certificates (which had come to represent only the guaranty), equal to their fair market value when Springfield was liquidated. Upon the sale of the certificates in 1944 there would have been a gain equal to the excess of the sale price over the new basis.

The government does not make the bald contention that the guaranty was an asset of Springfield's. It urges, however, that the holding company, having been the promisee under the original guaranty agreement with Consolidated, had such an interest in the guaranty that it would be fair to say that Springfield "distributed" the guaranty upon liquidation. We cannot agree. The essence of the relationship which the parties established is clear enough: If Springfield failed to make certain payments to its preferred shareholders, the guarantor was to make them. Obviously the holding company had an interest of a sort in this arrangement; it procured from Consolidated an agreement which undoubtedly facilitated the marketing of Springfield's preferred stock. But it was the preferred shareholders who had the paramount interest. However advantageous their having it might have been to the company, it was they who had the right to whatever payments might be made under the agreement. We cannot see how, upon liquidation, Springfield could have "distributed" anything in respect to the guaranty. After liquidation the shareholders had the same right against the guarantor which they had before; what was originally a conditional promise by the guarantor had merely become absolute by the happening of the condition.

It does not seem to us that questions which might turn upon slight changes in the language of the agreement, such as whether the guaranteed payments were to be made directly to the shareholders or through Springfield as a paying agent, should determine whether the guaranty was "distributed" within the meaning of the statute. Undoubtedly a wide range of verbal devices might be used to establish relationships with basically the same characteristics as this one. Minor aspects which might vary with different shadings of phraseology do not seem an appropriate basis for differentiating the tax treatment. But be that as it may, the language of the agreement in this case reinforces rather than weakens the conclusion that the guaranteed right to liquidating dividends of $105 per share was held by the shareholders rather than by Springfield. The instrument of guaranty executed by Consolidated in 1905 was a promise to Springfield to "*pay to the holders of the preferred shares* of the said Companies One Hundred and Five Dollars per share and accumulated dividends", and further, to "attach and execute the guaranty above set out on each certificate * * *." [Emphasis supplied.] The guaranty was executed on each share in similar language.

Whether this is viewed as a contract with Springfield wherein the guarantor agreed to and later did make a contract with each shareholder or as a contract with Springfield for the benefit of shareholders, it is plain that the parties anticipated payment to the shareholders directly and in all likelihood contemplated enforcement by shareholders directly. Indeed the guarantor's obligation with respect to liquidating dividends would not be enforceable until after Springfield, through liquidation, had ceased to exist. In normal course it would be expected that shareholders or someone acting upon their behalf, rather than Springfield, would enforce the guaranty.

The Commissioner argues that orders of the reorganization court recognized Springfield as owner of the guaranty. The first of these orders directed the trustees of Springfield to sell the securities held by Springfield and distribute the proceeds along with other assets, whereupon the guaranty claim would be allowed "for the account and benefit" of the preferred shareholders. A later order allowed the claim, again "for the account and benefit" of the preferred shareholders. As a matter of form, the reorganization court accepted a class or collective claim filed by the Springfield trustees on behalf of the preferred shareholders, instead of requiring individual claims

to be filed by each such shareholder. Far from recognizing that Springfield owned the guaranty, these orders are ambiguous on this point with which the reorganization court had no concern.

In United States v. Joliet & Chicago R. R. Co., 1942, 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658, a corporation had transferred all its property to a lessee and·in effect had made an anticipatory assignment of future rental income to its shareholders. It was held that this transparent tax evasion device failed of its purpose on the principle of Lucas v. Earl, 1930, 281 U.S. 111, 50 S. Ct. 241, 74 L.Ed. 731, and that the rental income paid by the lessee directly to the shareholders in proportion to their respective interests in the corporation must be returned by the corporation as income taxable to it. There is no comparable situation in the case at bar and we do not regard the government's reliance upon the Joliet case as well taken.

■ As we read its opinion, the Tax Court did not hold that the claim was "distributed" by Springfield to its shareholders within the meaning of § 115(c). Instead, it reasoned that since there clearly was a "complete liquidation" of Springfield within the meaning of that section, there must have been "full payment in exchange for the stock" giving rise to gain or loss under § 111 in 1939. "Received", in § 111 (b), rather than "distributed", in § 115(c), became for the Tax Court the key word. No necessary equivalence being perceived between what was distributed and what was received, the Tax Court held that the claim under the guaranty, which became absolute as a result of the liquidation, was "received" at that time.

It is argued on behalf of the Commissioner that the Tax Court's solution, however much it may involve a strained construction of the word "received" in § 111(b), is the only practicable one. We are told that § 115(c), in denominating distributions in complete liquidation as "full payment" in exchange for stock, requires that a balance be struck and a loss on the equity investment in Springfield be computed as of the time of liquidation. Apparently believing. that § 115(c) left no alternative but to say that upon liquidation final payment was made for the preferred stock as an indivisible item of property including the guaranty as part thereof, and that common sense required the guaranty to be treated as enhancing the value of such stock, the Tax Court resolved the difficulty by stretching the language of § 111(b), a section more amenable to construction than § 115(c).

But we are unwilling to concede that such a choice must be made between an unlikely construction and an unseemly result. The supposed dilemma rests upon the assumption that when taxpayer purchased the Springfield certificates he bought a single species of property, and that the noun "stock" in § 115(c) encompasses that property in its entirety, including the guaranty.

There is, however, another approach which gives full scope to the command of § 115(c) that amounts distributed in complete liquidation are to be treated as full payment for the stock, and yet does not entail so sophisticated an interpretation of the word "received" in § 111(b). What taxpayer acquired when he purchased these securities can, with perfect good sense, be viewed as two separate properties: For a single unallocated purchase price he was sold (1) an equity interest in Springfield, and (2) a contract right against New Haven requiring the latter to pay certain dividends if Springfield failed to do so. What he received upon the liquidation obviously was only that to which he was entitled by the first of these, the equity interest. The 25 cents a share was, in the words of § 115(c), "full payment in exchange for the *stock*". Just as obviously there was as yet no payment at all in satisfaction of the second property right, the claim against the guarantor, which taxpayer continued to hold until he sold it in 1944. When the transaction is so viewed it is no longer necessary, in order to satisfy § 115(c), to say that a contract right was "distributed" by the company to the taxpayer or "received" by the taxpayer, although he, rather than the company, possessed it all along.

Normally when a taxpayer acquires an aggregate of assets for a single purchase price, on subsequent sale of any portion he must allocate a part of the price he originally paid to the portion being sold on the basis of its proportionate value at the time of purchase so that gain or loss on the partial sale can be determined. E. g., Commissioner of Internal Revenue v. American Liberty Oil Co., 5' Cir., 1942, 127 F.2d 262; Commissioner of Internal Revenue v. Hagerman, 3 Cir., 1939, 102 F.2d 281; O. H. Himelick, 1935, 32 B.T.A. 792; see also Reg. 111, § 29.22(a)–8 and 11; compare Reg. 111, § 29.23(l)–4; Reg. 111, § 29.113 (a) (6)–1; see 3 Mertens, Law of Federal Income Taxation § 21.23 (1942).

In some situations, however, where at the time of the acquisition of the aggregation there was no separate market for the different parts of the aggregate, rational apportionment of the purchase price between the several elements purchased cannot be made. Perhaps the most frequent example is where common stock is received as a bonus with a purchase of preferred, there being no established market price for the common alone at the time of the transaction. This situation is covered by Reg. 111, § 29.22(a)–8 which provides: " * * * If common stock is received as a bonus with the purchase of preferred stock or bonds, the total purchase price shall be fairly apportioned between such common stock and the securities purchased for the purpose of determining the portion of the cost attributable to each class of stock or securities, but if that should be impracticable in any case, no profit on any subsequent sale of any part of the stock or securities will be realized until out of the proceeds of sales shall have been recovered the total cost." This regulation was applied in Helvering v. Taylor, 1935, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623.

There are, of course, situations not covered by the regulation where the purchase price of an aggregate of securities acquired as a unit cannot reasonably be allocated. Apparently, such situations have usually been accorded the same treatment as is called for in cases where the regulation applies. See Spreckels-Rosekrans Inv. Co. v. Lewis, 9 Cir., 1945, 146 F.2d 982; Barber Securities Corp. v. Commissioner, 1941, 45 B.T.A. 521. Cf. DeCoppet v. Helvering, 2 Cir., 1940, 108 F.2d 787. And it seems to us that if the regulation enunciates a sound rule, as unquestionably it does, a similar principle ought to govern analogous situations where the price paid for a bundle of assets cannot be allocated among them on a rational basis. See Inaja Land Co., Ltd. v. Commissioner, 1947, 9 T.C. 727, where this principle was applied to the sale of an easement over land. See also 3 Mertens, Law of Federal Income Taxation § 21.23 (1942), and cases cited.

In this case, if an allocation of the purchase price between the guaranty and the stock is possible, proper tax treatment would be, first, to determine gain or loss in the exchange of the stock at the time of Springfield's liquidation; by taking the difference between the 25 cents a share liquidating dividend and that portion of taxpayer's cost allocable to each share of stock exclusive of the guaranty, and second, to determine gain or loss at the time the guaranty was in effect disposed of, by taking the difference between the amount of the cost allocable to the guaranty and the amount received on the sale of the certificates. If it is wholly impracticable to make such an allocation of the purchase price, proper tax treatment would be to treat the cash disbursement upon liquidation in 1939 as a return of capital going to reduced basis, and to recognize no loss until the last part of the package, the guaranty, was sold in 1944.

Whether such an allocation could be made is a question for the Tax Court. Strauss v. Commissioner, 2 Cir., 1948, 168 F.2d 441. While the relative values of the equity interest and the guaranty at the time of Springfield's liquidation may not be adequate evidence to establish their relative values at the various dates on which taxpayer acquired the stock, see Helvering v. Taylor, supra, it is barely possible that some acceptable basis for making an allocation might be found if the Tax Court is given an opportunity to consider the mat-

ter. For this reason the case should be remanded to the Tax Court.

The decision of the Tax Court entered March 5, 1951, determining a deficiency herein, is vacated, and the case is remanded to the Tax Court for further proceedings not inconsistent with this opinion.