**WEYERHAEUSER STEAMSHIP COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 2483.**

United States District Court
W. D. Washington, S. D.

March 17, 1961.

Daniel C. Smith, Oliver Malm, Richard K. Quinn, Tacoma, Wash., for plaintiff.

Abbott M. Sellers, Acting Atty. Gen., Lyle M. Turner, Charles H. Magnuson, Dept. of Justice, Washington, D. C., Charles P. Moriarty, U. S. Atty., Seattle, Wash:, Charles W. Billinghurst, Asst. U. S. Atty., Tacoma, Wash., for defendant.

BOLDT, District Judge.

The money payments received by plaintiff, on which capital gain tax treatment is claimed, were agreed consideration for plaintiff's commitment to the payors not to apply for transfer foreign of specified liberty ships owned by plaintiff during continuance of a certain ship transfer policy of the United States Maritime Administration. At the time the right to apply for transfer foreign was a valuable incident of the ownership of plaintiff's ships and as such it was a property right.

The question for decision is whether the relinquishment, or forbearance in exercise, of such right was a "sale or exchange of property" qualifying income derived therefrom for capital gain treatment under § 1231 of the Internal Revenue Code of 1954, 26 U.S.C. § 1231. Unless the transactions fully met the requirements of that section the funds thus acquired were ordinary income as defined generally in § 61 of the Internal

Revenue Code of 1954 and more particularly in subsection (a) (3) of that section: "gains derived from dealings in property."

In the light of legislative intent and purposes stated and applied in the following cited decisions, the property right referred to is not "property" as that term is used in § 1231; nor, within the meaning of that section, is a covenant to forbear exercise of such right a "sale or exchange of property," or the equivalent thereof. Commissioner of Internal Revenue v. Gillette Motor Co., 1960, 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617; Corn Products Co. v. Commissioner, 1955, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29; Commissioner of Internal Revenue v. Glenshaw Glass Co., 1955, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483; Leh v. Commissioner, 9 Cir., 1958, 260 F.2d 489; Clover v. Commissioner, 9 Cir., 1944, 143 F.2d 570; Ullman v. Commissioner, 2 Cir., 1959, 264 F.2d 305; Terminal Steamship Co. v. Commissioner, 1960, 34 T.C. No. 94. This court finds nothing persuasive to the contrary in the decisions relied on by plaintiff: Hort v. Commissioner, 1941, 313 U.S. 28, 61 S. Ct. 757, 85 L.Ed. 1168; Metropolitan Building Co. v. Commissioner, 9 Cir., 1960, 282 F.2d 592; Commissioner of Internal Revenue v. Ray, 5 Cir., 1954, 210 F.2d 390; Commissioner of Internal Revenue v. McCue Bros. & Drummond, Inc., 2 Cir., 1954, 210 F.2d 752; Commissioner of Internal Revenue v. Golonsky, 3 Cir., 1952, 200 F.2d 72; Warren v. Commissioner, 1 Cir., 1952, 193 F.2d 996; Anton L. Trunk, 1959, 32 T.C. 1127; Hamilton & Main, Inc., 1956, 25 T.C. 878; Inaja Land Co., Ltd., 1947, 9 T.C. 727.

However designated by the parties thereto and whatever some of the legal characteristics thereof, the transactions under consideration by essential nature are not within the strictly limited category specified by statute for capital gain treatment in the computation of income tax.

Findings of fact, conclusions of law and judgment as proposed by defendant have this date been signed by the court and forwarded to the clerk for entry.

## Findings of Fact

1. This is a civil action brought under Title 28 U.S.C. § 1346(a) (1) for the recovery of income tax and interest assessed by the Commissioner of Internal Revenue against and paid by plaintiff to defendant under the Internal Revenue Code of the United States for the taxable calendar year 1954.

2. Plaintiff, a corporation duly organized under the laws of the State of Delaware on October 16, 1933, has maintained its principal place of business at Tacoma, Washington from the date of incorporation up to and including the date hereof. During all of the said years it has filed its federal income tax returns with the District Director of Internal Revenue at Tacoma, Washington.

3. Plaintiff, during the year 1954 and during the years prior and subsequent thereto, has engaged in the business of operating a dry cargo steamship fleet in intercoastal trade. As a steamship operator, it is the owner of a number of vessels. During the year 1954, it owned and operated seven dry cargo Liberty type vessels, each of which was owned by plaintiff for more than six months prior to the beginning of that year, and each of which was documented under the laws of the United States, and, as such, was an American flag vessel as required by law for vessels operating in intercoastal trade.

4. Under Sections 9 and 37 of the Act of September 7, 1916, Chapter 451, 39 Stat. 728, as amended (46 U.S.C.A. 1958 Ed., §§ 808 and 835), the Secretary of Commerce, acting through the Maritime Administration, exercised control over the transfers of vessels documented under the laws of the United States. It was within the power of the Maritime Administration to withhold the privilege of a ship owner to transfer its vessels to a foreign registry. However, until August 16, 1954, it was its policy to decide each application for transfer of a vessel on its own merits, using no specific rigid

policy. In deciding whether to permit a ship owner to transfer the vessel foreign, the Maritime Administration would consider such factors as the needs of our national defense, the life expectancy of the vessel, the need to attract private financing, the possibility of vessel replacement, the character of the vessel, the character of the transferee and other factors related to the national welfare.

5. Prior to the period beginning August 16, 1954, Weyerhaeuser operated all of its Liberty vessels in intercoastal trade. In order for each of Weyerhaeuser's vessels to engage in intercoastal trade, each such vessel was required to be registered under the American flag. Once a vessel was transferred to a foreign registry, it was disqualified from ever again engaging in intercoastal trade, and this disqualification remained permanent even if the ship was later returned to American registry. If Weyerhaeuser had ever transferred a vessel foreign, it could, therefore, never use that vessel again in intercoastal trade. As a result, it was not interested in transferring its ships to foreign registry, nor did it ever apply for a transfer foreign. When negotiating for the purchase of its Liberty ships, it gave no thought to foreign operations, nor did it attribute any value to the use of those ships under foreign registry. Instead of exercising its privilege to request transfer foreign for any or all of its seven Liberty vessels, Weyerhaeuser chose to use its Liberty vessels solely under United States registry during the entire time it owned them.

6. On August 16, 1954, the Maritime Administration changed its policy and adopted the rigid so-called "one-for-one" policy, which, in turn, was subsequently terminated approximately four months later in December, 1954. Under this temporary "one-for-one" policy, an owner of more than one Liberty vessel was permitted by the Maritime Administration to transfer one vessel foreign for each such vessel it agreed to retain under United States registry. Where the owner of only one Liberty vessel desired to transfer it to foreign registry, ap-

proval of the transfer of registry for such vessel was granted only if the owner joined forces or "paired-up" with another owner of a Liberty vessel and the other owner agreed to retain its ship under United States registry.

7. In accordance with this temporary "one-for-one" policy, taxpayer agreed to retain four of its Liberty vessels under United States registry in order to permit the owners of four other vessels to transfer such ships to foreign registry. In return for its agreements temporarily to retain four of its seven Liberty vessels under United States registry, Weyerhaeuser received, from the owners of the four vessels transferred foreign, the sum of $291,437.50. By retaining its ships under the American flag, Weyerhaeuser continued to use its Liberty vessels in the same manner as it had always done since their purchase before the "one-for-one" policy was put into effect, namely, under United States registry. There is no evidence in the record to show that Weyerhaeuser's shipping operations were in any way limited or restricted by its commitment agreements or that its business was in any way changed or altered by virtue of these agreements.

8. After the expiration of the "one-for-one" policy in December, 1954, retention agreements such as the four executed by Weyerhaeuser, were no longer considered as binding by the Maritime Administration. After the expiration of this temporary policy, when a ship owner requested allowance to transfer foreign a vessel which had been committed to United States registry during the period of the "one-for-one" policy, it was given the same consideration by the Maritime Administration as was afforded to owners of vessels which had never been committed to United States registry during the temporary "one-for-one" policy. Owners of committed ships, such as Weyerhaeuser had the same privileges as to transfers foreign as did owners of non-committed ships, since each was treated equally and given the

same consideration as to transfers foreign by the Maritime Administration.

9. Weyerhaeuser, at no time, transferred or otherwise disposed of any of its Liberty vessels during the period herein involved.

10. After the termination of the temporary "one-for-one" policy, Weyerhaeuser had the same rights with respect to the transfer foreign of its "committed" ships that it had prior to its entering into the "commitment" agreements and prior to the adoption of the "one-for-one" policy.

11. Under the "commitment" agreements, Weyerhaeuser agreed to use its ships only under United States registry until the "one-for-one" policy was terminated.

12. Under the "commitment" agreements, Weyerhaeuser agreed to forbear from requesting permission of the Maritime Administration to have four of its Liberty vessels transferred to and used under foreign registry.

Conclusions of Law

1. This Court has jurisdiction of this action and the parties thereto.

2. The income tax deficiency assessed by the Commissioner of Internal Revenue and collected from the plaintiff for the taxable year 1954 was proper and no refund is due under the claim asserted in this action.

3. The presumption favoring the correctness of the Commissioner's assessment is fully supported by the facts and law material to this case.

4. The transactions involved in this action did not result in the sale or exchange of property, capital assets or property used in the plaintiff's trade or business within the meaning of Sections 1221 and 1231 of the Internal Revenue Code of 1954, 26 U.S.C. §§ 1221, 1231.

5. Plaintiff, by agreeing to retain its vessels in United States registry, thereby voluntarily restricted the use to which it could put its Liberty vessels.

6. Plaintiff received the amount of $291,437.50 in return for its agreement to forbear from applying to the Maritime Administration for permission to have its Liberty vessels operated under foreign registry.

7. The payments received by the plaintiff for its agreements to retain its vessels in American registry constitute ordinary income within the meaning of the Internal Revenue Code.

8. The amounts received by the plaintiff under its retention agreements did not reduce the bases of the plaintiff's vessels.

9. The defendant is entitled to judgment in its favor dismissing plaintiff's complaint with prejudice and awarding defendant its costs and disbursements herein.