The INTER-STATE NATIONAL BANK OF KANSAS CITY, Appellant,

v.

Frank LUTHER, Trustee, Appellee.

Matter of GARDEN GRAIN & SEED COMPANY, Inc., Bankrupt.

No. 4816.

United States Court of Appeals, Tenth Circuit.

March 30, 1955.

Rehearing Denied April 29, 1955.

Phillips, Chief Judge, and Pickett, Circuit Judge, dissented.

Frank H. Terrell, Kansas City, Mo. (Guy A. Magruder, Jr., Kansas City, Mo., and James A. Williams, Dodge City, Kan., on the brief), for appellant.

Malcom Miller, Wichita, Kan., for appellee.

Before PHILLIPS, Chief Judge, and BRATTON, HUXMAN, MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

This appeal involves the claim of the Inter-State National Bank of Kansas City in the matter of the Garden City Grain and Seed Company, a bankrupt, in the District Court of Kansas. For background see Central States Corp. v. Luther, 10 Cir., 215 F.2d 38; First National Bank in Wichita v. Luther, 10 Cir., 217 F.2d 262; and Luther v. United States, 10 Cir., —— F.2d ——.

After entering its formal appearance, the Bank filed a proof of claim based on a $50,000.00 promissory note of the bankrupt dated October 31, 1951, due December 31, 1951, and collateralized by its warehouse receipt for 62,000 bushels of Number 2 yellow milo grain. It was affirmatively alleged that no part of the debt had been paid and that there were no offsets or counterclaims. The court was requested to convert the security into money, credit the amount upon the claim, and allow the balance, if any, as a common claim against the estate.

The trustee answered, admitting the execution of the note and the pledge of the warehouse receipt, but specifically denying the validity of such receipt as security for the note; and denying the right of the claimant to recover on the note because within four months of bankruptcy the claimant had obtained a $150,000.00 voidable preference through the payment to it of one promissory note in the amount of $100,000.00 and another for $50,000.00. It then alleged that unless the preference was returned to the trustee to become a part of the assets of the bankrupt estate, the claim should be disallowed as being without equity, and as being claimed by one coming into a court of equity with unclean hands.

In an "Action to Recover", the trustee alleged substantially the same facts and prayed for an order requiring the claimant Bank to pay into court the sum of $151,180.55 (principal and interest), and that in such event, the Bank's claim be allowed as a common claim in the amount of $50,000.00, plus interest. The trustee also filed an "Action in the Nature of an Interpleader" in which he joined all claimants to the liquidated inventory of milo, including the claimant Bank, and prayed for a deraignment of their interest therein. And, timely notice of the hearing on the interpleader was sent to all creditors joined therein, including the Bank.

On November 24, 1952, the referee commenced hearings on all the claims joined in the interpleader action. The purpose of these hearings was to determine the allowability, rank and priority

of the asserted claims against the grain account. The Bank's attorney of record appeared and participated in these proceedings, in the course of which he stated that he did not think it would be necessary to introduce evidence on its claim, the trustee having admitted relevant facts in his pleadings; and that he would like to defer hearing on the same until other related claims had been heard. But with respect to the "counterclaim", the Bank's attorney objected to the court's summary jurisdiction, expressly stating that he did not wish to submit the counterclaim on the pleadings, stipulate the facts with reference thereto, or in any manner consent to summary jurisdiction over such counterclaim.

The Bank's claim was thereupon formally continued until February 5, 1953. Thereafter, and before the case came on for hearing, the Bank filed its formal objection to the summary jurisdiction of the bankruptcy court over the trustee's "Action to Recover" on the grounds that it would deprive it of trial by jury, and offered to enter its general appearance in a plenary action instituted by the trustee, and to join with the trustee in a request for the immediate trial on the claims as soon as the pleadings were closed. In a further reply to the trustee's answer and "Action to Recover", the Bank renewed its objection to summary jurisdiction of the court over any and all claims for affirmative relief asserted against it by the trustee. It admitted the execution and receipt of the payment of the two notes alleged in the trustee's answer, but denied any and all other allegations.

After hearing in which all of the notes and warehouse receipts mentioned in the pleadings were admitted in evidence and testimony taken concerning the solvency of the bankrupt at critical times, the referee made extensive findings of facts, reciting the execution of the notes and warehouse receipts substantially as pleaded and agreed. On the jurisdictional question, the court took the view that in the exercise of its equitable jurisdiction to allow and disallow claims, determine setoffs and counterclaims, and enter such judgments as were necessary to enforce the Act, it was empowered to hear and determine the trustee's counterclaim to the Bank's claim filed in the proceedings. In so holding, the referee proceeded upon the premise that when a creditor files his proof of claim, he invokes the jurisdiction of the court and consents to the adjudication of all proper defenses, setoffs and counterclaims that may be lawfully imposed by the trustee.

Having thus sustained its jurisdiction of the counterclaim and the preference issue, the referee proceeded to find in effect that the Bank secured the payment of the bankrupt's notes in the sum of $150,000.00 and interest within four months of bankruptcy with actual or constructive knowledge of insolvency; and that in so doing, the Bank received a voidable preference. It accordingly offset the claim for the unpaid note against the voided preference and decreed that the trustee recover from the Bank the difference of $100,333.33.

On petition to review, the trial court affirmed the referee on jurisdiction and facts, but, denying the setoff against the preference, it rendered judgment against the Bank for the full amount of the preference in the sum of $150,875.00 (principal plus interest from date of preference) with interest thereon from the date of the filing of the action to recover; and ordered that the Bank's claim be allowed as a common claim only after payment of the preference.

■ Everyone apparently concedes, as they must, that the bankruptcy court is without summary jurisdiction to adjudicate a controversy respecting property or chose in action held adversely to the bankrupt estate without the consent of the adverse claimant. And, see Central States Corp. v. Luther, supra; City and County of Denver v. Warner, 10 Cir., 169 F.2d 508. The narrow and perplexing question here is whether the entry of the Bank's appearance in the bankruptcy proceedings and the filing of its claim

constituted requisite consent to the exercise of summary jurisdiction to adjudicate a preference and grant affirmative relief thereon.

While the trustee's affirmative pleadings are labeled "Action to Recover", they are in substance and effect an equitable counterclaim for an adjudication of a preference and a judgment for recovery of the same, the mode of procedure for which is governed by the Federal Rules of Civil Procedure, 28 U.S. C.A., and particularly Rule 13. See General Order of Bankruptcy Number 37, 11 U.S.C.A. following § 53.

Until recently, the trend of the decisions was undoubtedly opposed to summary jurisdiction by implied consent. The courts have continually gone back to Louisville Trust Co. v. Comingor, 184 U.S. 18, 22 S.Ct. 293, 46 L.Ed. 413, where the adverse claimant came into court in obedience to pre-emptory orders, and although he participated in the proceedings before the referee, he made formal protest to the exercise of summary jurisdiction before the final order was entered. On appeal, summary jurisdiction was denied on the grounds that the claimant, not having voluntarily come into court, did not consent to summary jurisdiction by participating in the proceedings before the referee. To the same effect see Pickens v. Roy, 187 U.S. 177, 23 S.Ct. 78, 47 L.Ed. 128; Galbraith v. Vallely, 256 U.S. 46, 41 S.Ct. 415, 65 L.Ed. 823. More recently it is held that by a petition for reclamation of specific property held by the trustee, the claimant did not subject himself to the summary jurisdiction of the bankruptcy court to enter a turn-over order "in respect of matters having no immediate relation to the claim which it had presented." Daniel v. Guaranty Trust Co. of New York, 285 U.S. 154, 52 S.Ct. 326, 328, 76 L.Ed. 675. Possession, either actual or constructive, was declared to be the touchstone of summary jurisdiction, and in the absence of voluntary acquiescence of the adverse claimant, the trustee's only remedy for the voidance of a preference or any other affirmative

relief was in a plenary action. See In re Rathman, 8 Cir., 183 F. 913.

But there was some deflection along the way, see Moonblatt v. Kosmin, 3 Cir., 139 F.2d 412, and the Supreme Court granted certiorari in Cline v. Kaplan, 323 U.S. 97, 65 S.Ct. 155, 89 L.Ed 97, to resolve conflicting views on matters affecting bankruptcy administration. That case involved the question of consent to proceed summarily to enter a turn-over order. Beyond reiterating the rule of the Comingor case, all the court decided was that requisite consent to summary jurisdiction depended upon the facts of the particular case; and that participation in the summary proceedings in obedience to an order to show cause did not amount to consent, provided formal objection was made before entry of the final order. The decision was criticized as not taking proper cognizance of the applicability of Rule 12 (h), F.R.C.P. See March 1948 Yale Law Journal, 683, 711; 2 Collier on Bankruptcy, 14th Ed., § 23.08, p. 524; In re Petroleum Conversion Corp., D.C., 99 F. Supp. 899, affirmed, 3 Cir., 196 F.2d 728.

Apparently inspired by this criticism and these recommendations, the Congress amended Section 2, sub. a(7) of the Bankruptcy Act, 11 U.S.C.A. § 11, sub. a(7) to provide that "where in a controversy arising in a proceeding under this title an adverse party does not interpose objection to the summary jurisdiction of the court of bankruptcy, by answer or motion filed before the expiration of the time prescribed by law or rule of court or fixed or extended by order of court for the filing of an answer to the petition, motion or other pleading to which he is adverse, he shall be deemed to have consented to such jurisdiction." The amendment was keyed to Rule 12(h), F.R.C.P. and was designed to bring waiver and consent in bankruptcy cases into conformity with the requirements of that applicable Rule. See H.R. 2320 and Sen.R. 1395.

The appellant invokes this amendment as conclusive of the question of

summary jurisdiction by implied consent, construing it in accordance with Rule 12(h) to provide for the waiver of the right to object to summary jurisdiction only if it is not made as provided therein; and contends that since timely objection was made in our case, there can be no implied consent to summary jurisdiction. The amendment did not purport to extend summary jurisdiction, In re Houston Seed Co., D.C., 122 F. Supp. 340, nor do we think it purports to extinguish that jurisdiction once it attaches. When considered against the background of the considerations which prompted the amendment, we think it has application only to controversies arising in bankruptcy proceedings where the adverse party is brought into court by pre-emptory process, as in turn-over order cases like Cline v. Kaplan, supra; and that it was not intended to apply to a claimant if he is already voluntarily in court.

On the question of conferrable summary jurisdiction by an appearance and the filing of a claim, there is respectable authority for denying summary jurisdiction to adjudicate a preference or to grant any affirmative relief on a counterclaim to a general claim filed in the proceedings. It is said that although a preference is a valid defense which the trustee may interpose to a claim, the bankruptcy court is without summary jurisdiction to hear and determine such defense, but can go no further than to determine the net amount of the claim and hold the same in abeyance until the preference issue has been adjudicated in a plenary suit, unless of course the filing claimant acquiesces in the exercise of summary jurisdiction over the counterclaim for preference. In re Continental Producing Co., D.C., 261 F. 627; In re Eakin, 2 Cir., 154 F.2d 717; B. F. Avery & Sons Co. v. Davis, 5 Cir., 192 F.2d 255, certiorari denied 342 U.S. 945, 72 S.Ct. 559, 96 L.Ed. 703; Solomon v. Allied Building Credits, 8 Cir., 209 F.2d 828; In re G. L. Odell Const Co., D.C., 119 F.Supp. 578. Other courts have sustained summary jurisdiction to adjudicate a preference on a counterclaim, but denied any such jurisdiction to grant affirmative relief. Metz v. Knobel, 2 Cir., 21 F.2d 317; Schwartz v. Levine & Malin, Inc., 2 Cir., 111 F.2d 81; Kleid v. Ruthbell Coal Co., 2 Cir., 131 F.2d 372; Fitch v. Richardson, 1 Cir., 147 F. 197; March 1948 Yale Law Journal, p. 711. The courts sustaining defensive summary jurisdiction do so on the theory that it is a necessary incident to the power to determine allowability. See 3 Collier § 60.60, p. 1033; 4 Collier § 68.20, p. 786. And, the question of preference having been thus adjudicated, it is res judicata in the plenary action for affirmative relief thereon. Giffin v. Vought, 2 Cir., 175 F.2d 186.

It was not until after Alexander v. Hillman, 296 U.S. 222, 56 S.Ct. 204, 80 L.Ed. 192, that summary jurisdiction to afford affirmative relief on the trustee's counterclaim was fully sustained. The Hillman case involved the exercise of equity jurisdiction in a receivership case. But it sustained the equitable jurisdiction over counterclaims for portions of the receivership estate adversely held by those who had filed their claims to a part of it. In doing so, the court proceeded on the valid premise that the parties having voluntarily invoked the equitable jurisdiction of the court, it was empowered to decide all matters in dispute and decree complete relief. The equitable doctrine of the Hillman case was apparently first applied by analogy to a bankruptcy proceedings in Florence v. Kresge, 4 Cir., 93 F.2d 784. After having been reversed in the Hillman case, that court could see no reason why the doctrine of the Hillman case should not be applied with equal force to the counterclaim of a trustee in bankruptcy against one who had filed his general claim against the bankrupt estate. The claim and the counterclaim arising out of the same contract, the court could see no reason why the bankruptcy court should not adjudicate the counterclaim in favor of the bankrupt estate and set them off against the claims filed against the estate.

■ The Second Circuit applied the Hillman doctrine to a claim in bankruptcy in Chase National Bank of City of New York v. Lyford, 2 Cir., 147 F.2d 273, 277. And see also Giffin v. Vought, supra; Floro Realty & Investment Co. v. Steem Electric Corp., 8 Cir., 128 F.2d 338; Columbia Foundry Co. v. Lochner, 4 Cir., 179 F.2d 630, 14 A.L.R.2d 1349. While these cases did not involve a preference, they were based upon the rule generally applicable in bankruptcy to the effect that once jurisdiction of a bankruptcy court has been invoked, whether by the debtor or the creditor, the petitioner risks "all of the disadvantages which may flow to him as a consequence, as well as gaining all of the benefits." Case v. Los Angeles Lumber, 308 U.S. 106, 127, 60 S.Ct. 1, 12, 84 L.Ed. 110. The consent by filing doctrine was first applied to authorize an adjudication of a preference in In re Nathan, D.C., 98 F.Supp. 686, 692, which, after an extensive review of all the authorities found "rational and solid ground for holding that a creditor, by presenting his claim for examination and allowance * * * impliedly consents to adjudication by the bankruptcy court in summary proceedings * * * of not only the merits of the claim and of any defenses or set-offs thereto * * * but also the merits of any counterclaim for affirmative judgment which the trustee may properly assert in response to the claim * * *." This view was firmly upheld in In re Solar Mfg. Corp., 3 Cir., 200 F.2d 327, certiorari denied sub nom Marine Midland Trust Co. v. McGirl, 345 U.S. 940, 73 S.Ct. 831, 97 L.Ed. 1366. And see also Conway v. Union Bank of Switzerland, 2 Cir., 204 F.2d 603; 2 Collier § 23.08, p. 528. We can see no valid difference, jurisdictionwise, in a counterclaim for preference sustained in the Nathan and Solar Manufacturing Corporation cases, and a claim based upon an obligation incurred prior to bankruptcy in the Kresge and Lochner cases. In either case, the jurisdiction of the court is based upon implied consent by invocation and is sustainable upon the same well-grounded equitable jurisdiction to render full and complete relief as between petitioning parties to the court.

■ The bankruptcy court has exclusive and summary jurisdiction to allow or disallow claims against bankrupt estates. Bankruptcy Act, § 2, sub. a. In the exercise of that jurisdiction, it "sits as a court of equity" clothed with jurisdiction "to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 246, 84 L.Ed. 281. See also W. F. Sebel Co. v. Hessee, 10 Cir., 214 F.2d 459; Central States Corp. v. Luther, supra; 1 Collier § 2.09, p. 162. And, claims of creditors who have received or acquired void or voidable preferences are not allowable unless such creditors shall surrender such preferences. Bankruptcy Act § 57, sub. g, 11 U.S.C.A. § 93, sub. g. Section 60, sub. a, 11 U.S.C.A. § 96, sub. a, defines a void or voidable preference, and Section 60, sub. b provides that such preference may be voided by the trustee. From this it seems manifestly clear that the bankruptcy court is empowered to attach appropriate conditions to the allowance of a claim, including the power to require the claimant to do equity before receiving equity in the bankruptcy proceedings. See Central States Corp. v. Luther, supra.

It is only a short, and to us a perfectly valid jurisdictional step from the summary power to adjudicate a voidable preference and summary power to grant affirmative relief thereon, especially when the authorized adjudication has binding effect in a plenary suit. Certainly the exercise of this affirmative equitable jurisdiction is within the substantive provisions of the Bankruptcy Act providing for the disallowance of claims tainted with a preference, i. e. see §§ 57, sub. g and 60, sub. a, supra.

■ The Bank earnestly contends, however, that in no event does the court have jurisdiction of a counterclaim for a preference which did not arise out of

the same transaction giving rise to the claim. And, it is said that the notes forming the basis for the counterclaim are separate and distinct transactions from the note on which the claim is based. Section 68, sub. a, 11 U.S.C.A. § 108, authorizes the setoff of all mutual debts or credits between the estate of a bankrupt and a creditor, and provides that the account shall be stated and one debt set off against the other; and that only the balance shall be allowed and paid. This Section of the Act does no more than import the time-honored doctrine of equitable setoff into the bankruptcy law. 4 Collier §§ 68.01–68.02, p. 703; 2 Remington on Bankruptcy 5th Ed. §§ 1431–1432–1433. The referee set off the claim against the counterclaim, stated the account and gave judgment in favor of the trustee for the balance.

And while Section 68 does not purport to confer jurisdiction not otherwise existing, Section 68, sub. a does authorize the court to balance the accounts between a creditor and the bankrupt estate based upon mutual debts or credits. See Luther v. United States, supra. Cf. Cherry Cotton Mills v. United States, 327 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835. Section 68, sub. b, however, prohibits the allowance of a setoff in favor of a debtor who obtains a preference under Section 57, sub. g, and it was manifestly for that reason the trial court denied the setoff allowed by the referee. Section 68 does not specifically provide for a counterclaim. It is silent with respect thereto beyond the negative provision that they shall not be allowed in favor of a debtor under specified conditions. See 4 Collier §§ 68.11–68.12. But Section 68 was not intended to govern jurisdiction or to provide a mode of procedure. The Federal Rules of Civil Procedure are expressly made applicable and we look to Rule 13 to determine whether the counterclaim is maintainable.

Counterclaim under Rule 13, F.R.C.P., includes both setoff and recoupment, and is broader than either in that it includes other claims and may be used as a basis for affirmative relief. See Clark Code Pleadings, 2d Ed. 637, cited 3 Moore's Federal Practice § 13.02, p. 9. Rule 13(a) F.R.C.P., provides for compulsory counterclaim "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim * * *." Rule 13(b) provides for a permissive counterclaim against an opposing party "not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim." The only difference in the two sub-sections which we need to note is that the compulsory counterclaim, being ancillary to the claim, derives its jurisdiction from the same source, whereas a permissive counterclaim not arising out of the same transaction or occurrence must rest upon independent grounds of jurisdiction. But even that distinction is of no consequence here for concededly the counterclaim is within the conferrable jurisdiction of the parties. And, being of the view that the Bank impliedly consented to the jurisdiction of the court, the counterclaim was maintainable under Rule 13(b), F.R.C.P., whether compulsory or permissible. See 3 Moore's Federal Practice §§ 13.18–13.19.

We hold, therefore, that the court acquired jurisdiction of the counterclaim by implied consent, and that it was authorized to adjudicate the preference and give judgment for recovery of the same.

To the contention that the Bank was denied the right to a jury trial, it need only be said that if, as we have held, the Bank impliedly consented to the summary jurisdiction of the court, it thereby pro tanto waived its right to a jury trial on the issues involved in the claim and counterclaim, including the preference issue.

On the preference issue, the trustee concedes the burden of proving the preference by a preponderance of the evidence, meaning that at the time the Bank secured or suffered the payment of the $100,000.00 note on its maturity

date of November 24, 1951, and the $50,-000.00 note on its maturity date of December 17, 1951, the bankrupt was "insolvent" in that on the critical dates, the aggregate fair market value of its assets was insufficient to pay its debts, § 60, sub. a of the Act, 11 U.S.C.A. § 96, sub. a; 1 Collier § 1.9, p. 67; 3 Collier § 60.30, p. 857; 4A Remington §§ 1686–1687; and that at such critical times the Bank had reasonable cause to believe that the bankrupt was insolvent. § 60, sub. b of the Act, 11 U.S.C.A. § 96, sub. b.

To prove insolvency, the trustee introduced in evidence an audit of all the books and records of the bankrupt from its inception in 1949 to the date of bankruptcy in January 1952. This audit showed the book value of the assets of the bankrupt as of September 30, 1951 (4 months next preceding bankruptcy) was $56,996.73 less than its liabilities; and that as of the date of bankruptcy, the assets of the company were $384,-547.03 less than its liabilities. And the auditor was permitted to testify that although the audit did not reflect a day-to-day balance of assets and liabilities, it did show that the bankrupt lost money from its inception, and that from September 30, 1951 to the date of bankruptcy, there was a continuous deterioration in the financial condition of the bankrupt.

■ Relevancy and probative value of the audit is challenged on the grounds that book value of the assets is not necessarily fair market value, and is therefore not a proper criterion for determining insolvency; that in any event, it does not purport to show the condition of the company on the alleged preference dates; and that the condition of the company on September 30 and on the date of bankruptcy is incompetent to prove insolvency on the critical dates. It is true that book value does not necessarily prove fair market value, Spreckels-Rosekrans Inv. Co. v. Lewis, 9 Cir., 146 F.2d 982, and it is also true that insolvency on the date of preference is the critical issue, and insolvency on any other date is insufficient standing alone to prove this essential element of a preference. Everett v. Warfield Mining Co., 4 Cir., 37 F.2d 328; Arkansas Oil & Mining Co. v. Murray Tool & Supply Co., 8 Cir., 127 F.2d 564. But, book value is not inadmissible evidence of fair market value, 4A Remington § 1691, and evidence of insolvency on dates before and after preference dates is competent evidence of insolvency on those dates, especially when considered with evidence of continued decline toward bankruptcy. 4A Remington §§ 1689–1690; 1 Collier § 1.19, p. 83.

Most of the assets of the bankrupt consisted of grain in storage and other items, the actual value of which was the book value; and the trustee qualified and was permitted to testify that the value of the physical assets of the bankrupt was less than the fair market value. The audit also showed that as a warehouseman and dealer in grain, it was short in its grain account on a rising market. Particularly, the audit showed that on September 30, 1951, the bankrupt was short 15,384,403 pounds of milo grain, its chief commodity; that on November 14, the shortage had increased to 24,350,216 pounds; that just prior to December 17 (one of the preference dates) the shortage had increased to 26,-158,937 pounds; and that on January 17, the shortage was 25,574,193 pounds. On the basis of this evidence, the trial court affirmed the referee's findings that the bankrupt was insolvent on the critical dates. And see Central States Corp. v. Luther, supra, where we held the bankrupt insolvent on about these same dates.

On the question of reasonable cause, the evidence showed that the Bank first extended credit to the bankrupt through its correspondent bank in Garden City, Kansas in 1950, and that during the interim between the first and last loans, the bankrupt owed the bank on promissory notes, collateralized by warehouse receipts, as much as $350,000.00. Most of these transactions were conducted

through the Garden City bank, but on some occasions the officers of the bankrupt dealt directly with the officers of the claimant Bank. On the 12th or 13th of November, the bankrupt owed the Bank $200,000.00, evidenced by promissory notes, all due on different dates before the first of January, 1952. At about that time, the Bank, through one of its officers, learned that an officer and stockholder of the bankrupt living in Texas "was in trouble", apparently over his grain accounts. This information caused the claimant Bank to re-examine its collateral in the form of warehouse receipts, resulting in a determination by the Bank's attorney that they were not in proper form in that they did not purport to represent that the grain covered thereby was owned by the bankrupt, but was owned by the Bank and stored for its account. After a meeting of the discount committee, and on the following day, two officers of the Bank, one of whom was its attorney, went to Garden City, where they first called upon the correspondent bank. The managing officer of the bankrupt was called in and the situation explained. As a result of this conference, the collateralized warehouse receipts were changed to reflect that the grain covered thereby belonged to the bankrupt. At the same time, new or substituted notes were executed on the Bank's regular form in identical amounts with the same maturity date, except one note was accelerated two days, and they were collateralized by new warehouse receipts.

The evidence concerning the investigation conducted by the officers of the Bank is in conflict, but it does show that the officers checked the warehouse receipt books against the grain in store; and there is also some evidence that they looked at the general books and ledgers of the bankrupt. They conferred with the bankrupt's attorney and returned to Kansas City. There was also evidence that the bankrupt's financial statement made to the Bank as of September 30, 1951, showed an overdraft in excess of $36,000.00, and that its books had not been posted since June 30, 1951.

The referee specifically found that the Bank's officers learned that the bankrupt's books were inadequately kept, but made no further investigation; that they devoted their attention to the validity of the collateral held by the Bank, and that the taking of the new notes and receipts indicated that the Bank was attempting to avoid any question of solvency or insolvency of the bankrupt by obtaining valid collateral for their notes.

■ While mere suspicion of insolvency does not amount to reasonable cause, it is sufficient if a preferred creditor has "such knowledge or notice of such facts and circumstances as would incite a person of reasonable prudence under similar circumstances to make inquiry. And if inquiry would lead to the development of facts essential to the knowledge of the situation, he will be chargeable with knowledge thereof." McDougal v. Central Union Conference Ass'n, 10 Cir., 110 F.2d 939, 941; 4A Remington §§ 1708–1709; 3 Collier § 60.54, p. 1001.

Making application of this rule to the facts and circumstances, the referee concluded that if the Bank had used the information at hand and made diligent inquiry into the financial condition of the bankrupt, it would have known that the bankrupt was insolvent; and that the Bank, through its representatives, therefore had reasonable cause to believe that the bankrupt was insolvent on November 14, 1951, and that such insolvency continued until the date of bankruptcy.

On the issue of reasonable cause, the Bank offered testimony to the effect that from time to time it consulted with employees of the Kansas Grain Inspection Department having statutory supervision of the bankrupt's warehouse, and that in pursuance of that inquiry, they were informed that the warehouse was found to be in balance on its grain account; and they also offered testimony of conversations with the bankrupt's

reputable attorney concerning the good reputation of the active officer of the bankrupt. This testimony was offered not for the purpose of showing the truth of such statements, but for the limited purpose of showing that the Bank relied and acted upon it, and that such testimony was competent to show lack of reasonable cause to believe that the bankrupt was insolvent on the critical dates. The trustee objected to this testimony on the grounds that it was hearsay and the referee tentatively sustained the objection. The Bank complains of the exclusion of this testimony, but the record plainly shows that upon reconsideration and the citation of authorities, the referee admitted all such evidence over the objections of the trustee. Moreover, in its order of affirmance, the trial court alluded to this evidence, specifically stating that it had "considered such evidence together with all other evidence contained in the record and had adopted and made its own findings of fact * * * after consideration of such disputed evidence."

The trial court affirmed the referee, and having regard for all the facts and circumstances, we are unable to say that those findings and conclusions are not supported by competent evidence. They are therefore not clearly erroneous and they are affirmed.

The $50,000.00 preference note, due December 17, 1951, was paid on maturity by a telegram from the Garden City bank directing the Inter-State Bank to debit its account for the amount of the note and interest. The Bank takes the position that the note having been paid by the Garden City bank and not the bankrupt, there was no transfer of the bankrupt's estate, hence no voidable preference. A "transfer" of a part of the debtor-bankrupt's property is of course the first essential element of a preference, and payments to creditors of a bankrupt by third parties or to the bankrupt for the specific purpose on the part of such third party to satisfy the debt of a creditor does not constitute a transfer within the meaning of the preference statute. Grubb v. General Contract Purchase Corp., 2 Cir., 94 F.2d 70; 4A Remington § 1670. But the payment by the third party must be made with the specified intention on his part that it shall be used for the purpose of discharging the particular debt to the particular creditor. In other words, the third party, not the debtor, must choose the creditor and the debt to be paid. Smyth v. Kaufman, 2 Cir., 114 F.2d 40, 130 A.L.R. 951 and annotation p. 956.

Two days after the payment of the preference note the bankrupt borrowed $50,000.00 from the First National Bank in Wichita, and the proceeds of this loan were credited to the Garden City bank. The referee observed that the funds from this loan were "probably" used to reimburse the Garden City Bank. But there is nothing in the record to indicate that the Wichita Bank intended that its loan would be used to pay the Inter-State Bank's note, or for that matter that it knew of the existence of any such note. Certainly there is nothing in the record to indicate that the loan was made on condition that it would be used for any specific purpose. The Garden City bank did not gratuitously pay the note to the Inter-State Bank. It was undoubtedly reimbursed by the Wichita bank and the whole transaction amounted to a preference.

The Bank also complains of the judgment of the court holding the collateralized warehouse receipts invalid as a lien upon the grain in store or the proceeds in the hands of the appellee. But the warehouse receipts involved here are not distinguishably different in tenor and effect from those held invalid in Central States Corp. v. Luther, supra.

The judgment of the trial court is affirmed.

PHILLIPS, Chief Judge, with whom PICKETT, Circuit Judge, concurs, dissenting:

The Garden Grain and Seed Company, Inc.,[1] was adjudged a bankrupt on an in-

1. Hereinafter called the Grain Company.

voluntary petition on January 18, 1952, and the matter was referred to Honorable E. R. Sloan, the Referee in Bankruptcy for the District of Kansas.

On October 31, 1951, the Grain Company executed and delivered to the Inter-State National Bank of Kansas City, Missouri,[2] a promissory note for $50,000, due December 31, 1951. Inter-State filed its claim on such note, which was secured by Public Warehouse Receipt No. 954, representing 62,000 bushels of milo, as a secured claim to the extent of the value of the security and as an unsecured claim for the excess, if any. The Trustee interposed a pleading to the claim, designated "Answer and Action to recover." It admitted the validity of the debt, but denied the validity of the security and alleged that Inter-State had received a voidable preference of $150,000, plus interest, by reason of payments made to it on November 20 and December 17, 1951, respectively, of two notes executed and delivered by the Grain Company to Inter-State; one, dated September 26, 1951, for the principal sum of $100,000, due November 24, 1951, and one dated October 18, 1951, for the principal sum of $50,000, due December 17, 1951, and prayed that Inter-State be required to pay into the court the sum of $151,180.-55, and that, thereafter, in the event of such payment, Inter-State's claim on the $50,000 note be allowed as a common claim. The Referee adjudged that Inter-State had received voidable preferences by the payment of the note on November 20, 1951, in the amount of $100,458.33 and by the payment of the note on December 17, 1951, in the amount of $50,-416.67, and that there should be offset the unpaid note on which the claim was filed, in the amount of $50,541.67 principal and accrued interest, and that the Trustee should recover from Inter-State $100,333.33.

On petition for review the District Court entered a judgment in favor of the Trustee and against Inter-State for $150,875, plus interest at six per cent per annum from the date of the filing of the Trustee's action to recover and ordered that Inter-State's claim be allowed as a common claim in the amount of $50,437.-22, after the payment to the Trustee of the judgment awarded him against Inter-State.

Inter-State has appealed.

The facts are not in substantial dispute. On September 18, 1950, at the request of Garden National Bank of Garden City, Kansas,[3] Inter-State made its first loan to the Grain Company. The Grain Company was a customer of the Garden City Bank, which was a correspondent of Inter-State and had maintained with Inter-State a deposit approximating $1,000,000 over a period of years. Mr. Newman, the officer of Inter-State who handled the loan, had been acquainted for years with Mr. Gish, President of the Garden City Bank, who bore an excellent reputation as a competent banker.

Subsequent to September 18, 1950, and down to October 31, 1951, Inter-State made 15 separate secured loans to the Grain Company, aggregating approximately $900,000. There was no pre-existing commitment to make any of such loans. Each was submitted to Inter-State by the Garden City Bank for acceptance or rejection. No loan was handled directly with the Grain Company. The aggregate of the loans varied from a high of $335,000 in March, 1951, to a low of $50,000 on September 26, 1951. Except for the last loan of $50,000, on which the claim was filed, each loan was currently and satisfactorily handled by payment or renewal.

On September 26, 1951, only one loan for $50,000 remained unpaid. On that date, the Grain Company gave to Inter-State a new 60-day note for $100,000, representing a renewal of the outstanding $50,000 loan and a new loan of $50,-000. Inter-State was furnished a September 30 financial statement of the Grain Company, which listed as a liability a bank overdraft of $36,000, and

2. Hereinafter called Inter-State.

3. Hereinafter called the Garden City Bank.

showed an excess of assets over liabilities, or net worth, of $463,000. Thereafter, on October 18, 1951, another loan of $50,000 was made, evidenced by a note due December 17, 1951, and on October 31, 1951, another loan of $50,000 was made, evidenced by a note due December 31, 1951. The additional borrowings were required by reason of a large maize crop and the inability of the Grain Company to obtain cars to ship the grain. Each of the three notes, like the previous loans, were secured by warehouse receipts for grain, specifically described therein, issued by the Grain Company.

At a discount committee meeting of Inter-State on November 13, 1951, it was reported by an officer of Inter-State, who had just returned from a trip to Texas, that he had heard rumors that a Mr. Henderson, a resident of Texas and an officer of the Grain Company, was in some difficulty in Texas. Because of this, the notes of the Grain Company held by Inter-State and the warehouse receipts securing them were examined by counsel for Inter-State. The receipts appeared erroneous in form, in that they had been prepared as if Inter-State had deposited the grain covered by the warehouse receipts, which was not true. Mr. Newman, Vice-President of Inter-State, called Mr. Douglass of the State Grain Inspection Department and made inquiry concerning the Grain Company. Mr. Douglass advised Mr. Newman that the Grain Department had recently inspected the Grain Company and that "it was all right." He volunteered to check the warehouse receipt numbers and reported back that they did not correspond with his records. Mr. Douglass came to the banking house and reported to Inter-State that the receipts held by it were not authorized. Mr. Douglass left the banking house, but returned in about an hour with Mr. Emrie, head of the State Grain Inspection Department. Mr. Emrie told Inter-State that the Grain Company had been examined a few weeks before and had been found in good condition. He stated that there had been a little trouble between the Grain Company and the Commodity Credit Corporation, because Commodity's grain had not been in the elevator which the receipts or other documents called for, but that the grain had been in other elevators, and the difficulty was all straightened out. Inter-State requested Emrie to make another inspection of the Grain Company and he agreed to do so within a week or ten days and inform Inter-State of the results of such inspection. As a result of the conversation with the Grain Inspection Department, Mr. Newman and Mr. Terrell, attorney for Inter-State, went to Garden City "to find out about these warehouse receipts" which had been discovered to be on other than the state's printed form. The fact that Marteney, Vice-President and General Manager of the Grain Company, had used such unauthorized receipts gave Inter-State concern and it wanted to know why he had used the private forms. Newman and Terrell arrived at Garden City about 5:00 a. m., on November 14, 1951. They conferred first with Mr. Gish of the Garden City Bank, the Grain Company's principal banking connection and consultant. Later, Marteney was called into the meeting and the question of the propriety of the receipts was raised. Marteney expressed much surprise and stated that Mr. Dock of the State Grain Inspection Department had told him to use that type of receipt to pledge the Grain Company's own grain. Marteney so testified at the hearing on the claim. Marteney was not hesitant or embarrassed in his explanation and offered to issue the state form of receipt if the ones held by Inter-State were not proper. The group then proceeded to the office of the Grain Company, where new state form receipts were prepared, with ink deletions to state that the Grain Company owned the grain represented by the receipts and the new receipts were endorsed to Inter-State. Each of the existing notes described the particular receipts given to secure it. New notes were prepared, each of which described the particular new receipts given to secure it. New receipts, securing each note, respectively, were attached

to it. The old notes were surrendered to the Grain Company. Inter-State did not request acceleration of the due dates, nor did it ask for additional collateral. The acceleration by one day of the maturity date of the note payable November 25, 1951, was due to error, the intent being to make the due dates of the new notes exactly the same as the original notes. Inter-State believed Marteney's explanation of the private receipts and his readiness to comply with what appeared to be the regular way to effect the grain pledge and believed that Marteney had not acted in bad faith. After that transaction was completed, Inter-State's representatives asked about other outstanding receipts. Marteney produced the Grain Company's receipt books for both state and private receipts, and the quantity of grain represented thereby was noted. In view of Emrie's statement of the day before, the figure for grain owed Commodity was supplied by and accepted orally from Marteney, as was Marteney's estimate of grain in open storage, the latter being a day-to-day situation, necessitating an estimate. The Grain Company's total grain liabilities were thus estimated. While Marteney's evidence may have raised some question about whether the other books were inspected, summed up it was only to the effect that the warehouse receipts were inspected. Inter-State's evidence unequivocally was to the effect that only the warehouse receipts were inspected. They did inquire about Marteney's year-end audit, which he indicated had been delayed and would be completed very soon.

Inter-State's representatives suggested that Marteney write a letter to Emrie in his official capacity as chief inspector, describing the substitution of the state receipts for private receipts and listing the private receipts remaining outstanding. At Marteney's request, the letter was dictated by Terrell, signed by Marteney, and immediately mailed to Emrie. Emrie made no reply thereto. Marteney assured Inter-State that the Grain Company could pay the notes when due.

That afternoon Newman, Marteney, and Gish made a physical check of the grain in the possession of the Grain Company. A record was kept of the estimated grain found on hand, the total of which was compared with the total grain liabilities. The comparison showed grain on hand in excess of liabilities.

After talking with Emrie by telephone, Terrell and Newman returned to Kansas City the morning of November 15. Terrell made a written report to Inter-State, the conclusions of which were that the Grain Company had the grain it was supposed to have, and that its difficulties arose from inability to obtain cars to ship the grain. Mr. Newman, being convinced that the Grain Company had the grain that it was supposed to have and that Marteney was honest, reported that fact to Inter-State.

Within a week or two after November 14, 1951, Emrie called Terrell and told him that the Grain Company had once more been checked by the State Grain Department and found to be in balance on its grain and that he intended to send the Grain Company a book of state form receipts for use in pledging its own grain, and to appoint Gish as registrar for the Grain Company.

On November 20, 1951, the $100,000 note due November 24, 1951, was paid, with interest, by the process of charging that amount against the account of the Garden City Bank with Inter-State and crediting the note of the Grain Company, all done pursuant to telephone instructions from the Garden City Bank. The Grain Company had given to the Garden City Bank its check for $100,000, payable to Inter-State. The charge and credit accomplished by telephone was a usual and customary banking practice and it saved the Grain Company several days' interest. The payment of the note a few days prior to its maturity was not pursuant to any demand and was a customary banking practice.

On December 17, 1951, the $50,000 note due on that date was paid, with interest, likewise by charging the account of the Garden City Bank and crediting the

Grain Company's note, pursuant to instructions by wire from the Garden City Bank. The Grain Company had not furnished the funds to make that payment. Marteney thought the money used to pay the $50,000 note had been borrowed from a Wichita bank, but the loan by the Wichita bank was made on December 19, 1951. The proceeds of the December 19 loan from the Wichita bank were never credited to the Grain Company's account and no check was drawn on the Grain Company's account for such payment to Inter-State. However, it appears likely that the Garden City Bank received the proceeds of the Wichita bank loan.

11 U.S.C.A. § 96, sub. a(1) defines a preference as follows:

"A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."

11 U.S.C.A. § 96, sub. b provides that:

"Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent. * * *"

11 U.S.C.A. § 93, sub. g provides that:

"The claims of creditors who have received or acquired preferences, * * * shall not be allowed unless such creditors shall surrender such preferences, * * *."

11 U.S.C.A. § 108 provides:

"a. In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.

"b. A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate and allowable under subdivision g of section 93 of this title; * * *."

11 U.S.C.A. § 11, sub. a(7), in part, provides:

" * * * where in a controversy arising in a proceeding under this title an adverse party does not interpose objection to the summary jurisdiction of the court of bankruptcy, by answer or motion filed before the expiration of the time prescribed by law or rule of court or fixed or extended by order of court for the filing of an answer to the petition, motion or other pleading to which he is adverse, he shall be deemed to have consented to such jurisdiction".

A court of bankruptcy is without jurisdiction to adjudicate in a summary proceeding a controversy in reference to property acquired prior to bankruptcy and held adversely to the bankrupt estate, without the consent of the adverse claimant. Absent such consent, the trustee must resort to a plenary suit.[4]

Inter-State timely challenged the jurisdiction of the referee to adjudicate the claims of the Trustee that Inter-State had received voidable preferences.

The jurisdictional question here presented depends on whether Inter-State, by filing its general claim, consented to the adjudication by the bankruptcy court in a summary proceeding of the two alleged unlawful preferences.

---

**4.** City and County of Denver v. Warner, 10 Cir., 169 F.2d 508, 511; Mueller v. Nugent, 184 U.S. 1, 15, 22 S.Ct. 269, 46 L.Ed. 405; Galbraith v. Vallely, 256 U.S.

46, 48, 41 S.Ct. 415, 65 L.Ed. 823; Cline v. Kaplan, 323 U.S. 97, 65 S.Ct. 155, 89 L.Ed. 97; Harrison v. Chamberlin, 271 U.S. 191, 193, 46 S.Ct. 467, 70 L.Ed. 897.

The loans and payments thereof, which the Trustee asserted constituted voidable preferences, while like the loan on which the Inter-State claim was predicated, were wholly distinct and separate from the latter. No commitment for a line of credit had been made to the Grain Company and each application for a loan was passed upon by Inter-State when it was made. The transactions of November 14 did not alter the situation. New notes were taken for existing notes. Each evidenced separate and distinct loans theretofore made. While new collateral was taken, it was not given as a general pledge, but separate and distinct warehouse receipts were pledged as collateral for each of the several notes.

It follows that the transactions upon which the alleged voidable preferences are predicated did not arise out of, and are not connected with, the claim filed by Inter-State, but are wholly distinct therefrom.

It should be kept in mind that a voidable preference arises only if a transfer is made under the conditions laid down in 11 U.S.C.A. § 96 and bankruptcy ensues within four months thereafter. It is not a cause of action or a defense which existed in the bankrupt prior to bankruptcy, but is a cause of action or a defense inuring only to the trustee.

Moreover, with respect to the claim of a creditor who has received a voidable preference, it is not ordinarily a defense to a claim per se. Rather, it merely precludes the allowance of a valid and enforceable claim until the preference has been surrendered. It is a condition precedent to allowance and not a defense to the claim per se.

There can be no doubt that a creditor who has received a voidable preference may not have a general claim allowed until he has surrendered such preference.

It is my opinion that where the transaction upon which the alleged voidable preference is predicated is not connected with and did not arise out of the transaction upon which the claim of the creditor is predicated and does not constitute a defense per se thereto, the alleged voidable preference cannot be set up as a counterclaim to the creditor's claim and adjudicated by the referee in the exercise of his summary jurisdiction, if the creditor, as here, makes timely objection to the exercise of the summary jurisdiction.

If the law be otherwise, the filing by the creditor of a claim for a valid debt, due and owing, would constitute a surrender by the creditor of his right to have an adverse claim adjudicated in a plenary proceeding, agreeable to the processes in such a proceeding, in the venue which the statutes accord such creditor, and with a trial by jury in appropriate cases, even though the claim by the trustee of a voidable preference has no connection with the common claim of the creditor and constitutes no defense per se to such claim. It seems to me my view finds strong support in Daniel v Guaranty Trust Co., 285 U.S. 154, 52 S. Ct. 326, 76 L.Ed. 675. There, the Peters Trust Company of Omaha, Nebraska, was adjudicated a bankrupt. The Guaranty Trust Company undertook to recover from Daniel, the bankruptcy trustee, certain bonds which it alleged the bankrupt had fraudulently ordered and received and the title to which had not passed to the bankrupt. The trustee by counterclaim undertook to recover from the Guaranty Trust Company certain alleged moneys of the bankrupt, which he asserted had been paid to the Guaranty Trust Company after bankruptcy. It is true that the Guaranty Trust Co., in that case, sought a specific claim against property in the hands of the trustee, and not a general claim against the bankrupt estate, but the broad language used by the court, I think, is equally applicable in the instant case. At pages 161 and 162, of 285 U.S., at page 328 of 52 S.Ct., the court said:

"* * * The Circuit Court of Appeals upheld the objection offered to the jurisdiction of the referee and upon that ground reversed the Dis-

trict Court. [8 Cir.], 49 F.2d 866, 868. It said:

" ' * * * The petition of appellant for reclamation and the portion of the trustee's answer which asked for affirmative relief were, in fact, petitions by the parties asking the referee to exercise his summary jurisdiction in proceedings in bankruptcy. The two proceedings were quite distinct. Appellant sought to recover certain bonds to which it claimed title. The trustee sought an order that appellant should pay over money of the bankrupt estate received by appellant, after bankruptcy. The proceedings would not have been more unrelated to each other, if the trustee had sought an order on appellant for the delivery of books and papers such as was asked in Babbitt v. Dutcher, 216 U.S. 102, 30 S.Ct. 372, 54 L.Ed. 402, or an order for the examination of witnesses such as was asked in [Re] Elkus, Petitioner, 216 U.S. 115, 30 S.Ct. 377, 54 L.Ed. 407. We have been cited to no authority for the proposition that a creditor or other petitioner asking specific relief against a bankrupt's estate, as provided by the Bankruptcy Act, thereby becomes subject to summary orders by the referee in matters entirely disconnected from the subject-matter of such claim or petition, and no such authority is believed to exist.'

"The conclusion of the Circuit Court of Appeals is correct and its decree must be affirmed.

"In the circumstances, Did the referee have jurisdiction to enter the turnover order against the trust company? The answer must be 'No' unless that company by filing its petition for reclamation entered its general appearance and in effect consented to submit itself to summary proceedings before that officer in respect of matters having no immediate relation to the claim which it had presented.

"In practice such a rule might lead to unfortunate complications and deprive owners of property of fair opportunity to recover. The risk incident to a general appearance and consent to adjudication of claims of all kinds might easily deter where the right to recover is clear. Moreover, the choice would not be between tribunals merely, but between the ordinary processes in a plenary suit and a summary hearing. We are not cited to any opinion by an appellate court which definitely approves the view advanced by the petitioner. We cannot conclude that the demand for speedy administration of bankrupt estates is enough to justify such a radical departure from ordinary procedure. * * * " (Italics mine.)

The Trustee cites only one case, so far as I am able to discover, which sustains the right of the Trustee to assert a counterclaim for an alleged voidable preference against a common claim filed by the creditor alleged to have received such voidable preference. That is In re Nathan, D.C.S.D.Cal., 98 F.Supp. 686, 688. That case was disposed of on the pleadings and the precise facts are not disclosed. The creditor filed a claim upon promissory notes against the bankrupt estate. The trustee filed a counterclaim, alleging that within four months next preceding the filing of the petition in bankruptcy the creditor had received from the bankrupt voidable preferences arising " 'out of the [same] transaction or occurrence that is the subject matter of the * * * claim. * * * ' " The fact that the claim and the alleged voidable preferences arose out of the same transaction distinguishes the Nathan case from the instant case.

In re Solar Manufacturing Corporation, 3 Cir., 200 F.2d 327, was a Chapter X proceeding. The debtor had entered into an indenture agreement with the Marine Midland Trust Company as trustee, pursuant to which debenture bonds were issued. On May 2, 1947, the inden-

ture trustee loaned the debtor $650,000, evidenced by the debtor's unsecured note. Between January 28, 1948, and June 30, 1948, the debtor repaid $275,000 of this loan. On October 27, 1948, the date on which the debtor filed a Chapter XI proceeding, later dismissed, the indenture trustee, as a set-off against the amount due on the note, appropriated $45,078, which the debtor had in its general bank account with the indenture trustee. In June, 1948, the debtor sold its Chicago plant for $450,000 and deposited that sum in its general bank account with the indenture trustee. Between September 3, 1947, and on October 21, 1948, the indenture trustee financed $1,505,558 of debtor's accounts receivable, on which it allegedly made a profit of $7,963. On March 11, 1949, the indenture trustee filed a claim for $5,000 for services and expenses as indenture trustee. On March 31, 1949, it filed another claim for $354,340 due on the note and for $13,985 based on alleged breaches of warranty and representations made on the sale to it of debtor's accounts receivable. The trustee filed a counterclaim in which he charged that the indenture trustee had accepted payments on debtor's note and had appropriated debtor's bank account while debtor was insolvent, with knowledge by the indenture trustee of such insolvency; that the indenture trustee was derelict in its duties in failing to earmark the money received from the sale of the Chicago plant for the benefit of debenture holders, as provided by the trust indenture, and that the financing of debtor's accounts receivable constituted loans secured by pledge, in violation of the trust indenture. The court sustained the power of the referee to entertain and adjudicate the counterclaim under its summary jurisdiction. It will, however, be observed that the counterclaim and the claims asserted by the indenture trustee as creditor arose out of and were connected with the same transactions.

In Columbia Foundry Co. v. Lochner, 4 Cir., 179 F.2d 630, 14 A.L.R.2d 1349, the court sustained the jurisdiction of the bankruptcy court to entertain a counterclaim interposed against a claim filed by a creditor. However, the claim was for a balance due on certain shipments of merchandise sold and delivered to the bankrupt. The trustee set up in a counterclaim that the merchandise had hidden defects and that the use of it in the bankrupt's business resulted in financial loss and damages to the bankrupt in excess of $100,000. The claimant moved that the trustee's counterclaim be dismissed in so far as it asserted a counterclaim in excess of the claim, on the ground that the bankruptcy court lacked jurisdiction. The court, in sustaining the jurisdiction, adverted to the fact that the counterclaim related to the same subject matter as the claim and stated that its decision was confined to a situation of that kind. The counterclaim arose out of the same transaction as the claim and would have constituted a defense to the claim by the bankrupt, had action been brought on the claim prior to bankruptcy.

In Florance v. Kresge, 4 Cir., 93 F.2d 784, a sublessor had contracted to pay certain rental agents, who later became bankrupt, a commission on the rentals collected and a percentage of the proceeds realized under the sublease. The sublessor filed a claim for rentals and his share of the profits retained by the rental agents and a petition for rentals collected and commissions deducted by the receivers of the bankrupt. The trustee asserted counterclaims for commissions and profits. The court sustained the summary jurisdiction of the referee to entertain and adjudicate such counterclaims. Clearly, the counterclaims arose out of the same transaction and would have constituted defenses to the claim, had it been asserted against the bankrupt prior to bankruptcy. For the same reason the following cases are distinguishable from the instant case: James Talcott, Inc., v. Glavin, 3 Cir., 104 F.2d 851; Floro Realty & Investment Co. v. Steem Electric Corporation, 8 Cir., 128 F.2d 338; Gardner v. State of New Jersey,

329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504; In re Semolina Macaroni Co., D.C., 109 F.Supp. 453; In re Petroleum Conversion Corporation, D.C., 99 F.Supp. 899; Conway v. Union Bank of Switzerland, 2 Cir., 204 F.2d 603.

It must be conceded that the Second Circuit has held that where a creditor files a claim and the trustee sets up that such creditor has received a voidable preference, the referee may adjudicate the question of whether such voidable preference was received by the creditor and if the referee adjudges that it was received, he may deny the allowance of the claim. The Second Circuit further has held that in a subsequent plenary action to recover such preference the adjudication of the summary proceeding on the claim is res judicata.

In Metz v. Knobel, 2 Cir., 21 F.2d 317, the court so held, but in that case the claimant filed a claim for merchandise sold. The trustee filed a claim for a voidable preference for merchandise returned to the creditor. There, the alleged preference was directly connected with the claim of the creditor.

In Schwartz v. Levine & Malin, 2 Cir., 111 F.2d 81, the doctrine of res judicata indicated above was sustained. Whether the claim and the alleged preference arose out of the same transaction does not appear.

It is my conclusion that where a creditor has filed a general claim and the trustee asserts that such creditor has received a voidable preference, which he has not surrendered and which precludes the allowance of the claim, and where the general claim and the alleged voidable preference arise out of separate and distinct transactions, and the alleged voidable preference does not constitute a defense per se to the claim, but merely creates a condition which must be fulfilled before the claim is allowed, the filing of the general claim does not constitute a consent to the adjudication of the voidable preference by the referee in the exercise of his summary jurisdiction; and that the proper procedure in such cases is for the referee to inquire as to whether the adverse claim is merely colorable or whether it is really adverse, substantial, and asserted in good faith, and that if the referee finds the latter, he should stay the proceedings on the claim and direct the trustee to file a plenary suit to recover the alleged unlawful preference. Such a procedure would protect the bankrupt estate and at the same time accord the adverse claimant his right to a trial by jury in appropriate cases, his statutory right to have the suit brought and tried in the proper venue, and his right to have the action tried, agreeable to the ordinary processes of a plenary action. That procedure was approved in Triangle Electric Co. v. Foutch, 8 Cir., 40 F.2d 353, 356; In re Continental Producing Co., D.C.S.D.Cal., 261 F. 627, 629; B. F. Avery & Sons v. Davis, 5 Cir., 192 F.2d 255, 259, and In re G. L. Odell Construction Co., D.C.Colo., 119 F.Supp. 578, 581. To hold otherwise would require a general creditor with a valid general claim to choose between foregoing his general claim or waiving his right to have his adverse claim adjudicated under the ordinary processes of a plenary suit, in a proper venue and with a right to a jury trial, where appropriate, rather than in a summary bankruptcy hearing.

I would reverse the judgment of the District Court and remand the matter, with instructions to stay the proceedings on the claim and direct the Trustee to file a plenary suit to recover the alleged unlawful preference.